# EXHIBIT A

1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

ERNESTINE PARKER,                    )
                                     )
            Plaintiff,               )
                                     )   Civil Action
            Vs.                      )   No. 04-344
                                     )
COMCAST CORPORATION, a Pennsylvania  )
corporation, COMCAST CABLE           )
COMMUNICATIONS, INC., a Delaware     )
corporation, COMCAST CABLEVISION OF  )
NEW CASTLE COUNTY, LLC, a Delaware   )
Limited Liability Corporation,       )
a successor in interest to Comcast   )
Cablevision of New Castle, Inc., a   )
Delaware corporation, PHILIP         )
ANNONE and WILLIAM G. MOSLEY,        )
                                     )
            Defendants               )


            Deposition of ERNESTINE PARKER taken pursuant
to notice at the law offices of Ballard, Spahr, Andrews &
Ingersoll, 919 Market Street, Wilmington, Delaware,
beginning at 9:57 a.m., on Thursday, August 11, 2005, before
Allen S. Blank, Registered Merit Reporter and Notary Public.


APPEARANCES:

        PHILIP B. BARTOSHESKY, ESQUIRE
        BIGGS & BATTAGLIA
        921 North Orange Street
        Wilmington, DE 19801

            For - Plaintiff




                    WILCOX & FETZER
        1330 King Street - Wilmington, Delaware 19801
                    (302) 655-0477



WILCOX & FETZER LTD.
Registered Professional Reporters



ORIGINAL

1   APPEARANCES:  CONTINUED

2            JOHN B. LANGEL, ESQUIRE
             FARRAH I. GOLD, ESQUIRE
3            BALLARD, SPAHR, ANDREWS & INGERSOLL, LLP
             1735 Market Street, 51st Floor
4            Philadelphia, PA 19103-7599

5                 For - Defendants

6   ALSO PRESENT:

7            DAVID E. BRIER, ESQUIRE

8            WILLIAM G. MOSLEY

9
                      * * * * * *
10

11                  ERNESTINE PARKER,

12           the deponent herein, having first been

13           duly sworn on oath, was examined and

14           testified as follows:

15                  EXAMINATION

16   BY MR. LANGEL:

17     Q    Ms. Parker, we just met a moment ago.  And my name

18   is John Langel and I'm one of the lawyers representing

19   Comcast in connection with a lawsuit you have brought.  And

20   today I'm going to be asking you a series of questions about

21   the allegations you're making in this lawsuit.

22              I know that you have been deposed at least once

23   before by Mr. Brier in another case.  Have you been deposed

24   any other times other than the time when Mr. Brier deposed

```
1      you?

2          A    No.

3          Q    A few ground rules.  And I also know that Mr. Brier

4      shared these ground rules with you last time.

5               The court reporter is taking down everything we

6      say.  A few things are important because of that.  One, even

7      though you may know the question I'm going to ask you, you

8      need to wait until I have completed the question.  Let me

9      finish the question before you start your answer to make it

10     easier on the court reporter so that we can get a nice,

11     clean, uninterrupted transcript that everybody can

12     understand when they go back and read it.

13               The second is that you respond verbally.  The

14     court reporter can't take down your nodding your head yes.

15     I can understand when you nod your head yes or shake your

16     head no.  He can't write that down.  And that becomes

17     difficult for him to interpret.

18               The other thing is, things like uh-huh and

19     um-hmm, try to say yes, no, those kinds of things.

20               Do you understand what I have said there?

21         A    Yes, sir.

22         Q    And will you do that?

23         A    Yes.

24         Q    All right.  If at any time you want to take a break,
```

1       Q      And did you use the computer?

2       A      Yes.

3       Q      Did you use the computer every day?

4       A      Yes.

5       Q      And what would you do on the computer?

6       A      Look up information.  Mostly for e-mails.  E-mails

7    that I received.  I don't remember.

8       Q      I read somewhere, and we'll go find it later, that

9    you say that you spent up to three to six hours a day on the

10   computer.  Did you use the computer a lot?

11      A      Yes, I did.

12      Q      Did you ever have any difficulties performing any of

13   your job duties?

14      A      No.

15      Q      Never had for your entire time as a human resource

16   clerk any difficulty performing any of your job duties?

17      A      No.

18      Q      No problem working on the computer?

19      A      No.

20      Q      No problem reading anything on the computer?

21      A      No.

22      Q      Did you ever seek assistance from anyone to perform

23   your job duties as the human resources clerk?

24      A      No.



1        Q     And you say chronic daily.  Tell us exactly how

2     often you get these?

3        A     Every day.

4        Q     I asked you earlier if you ever had any difficulty

5     performing any of your job duties.  And I believe you said,

6     no?

7        A     That's right.

8        Q     So, then, your headaches never prevented you from

9     doing your job?

10       A     They did not.

11       Q     And even though you had to do a lot of reading on

12    the computer, your headaches never prevented you from doing

13    the reading on the computer, correct?

14       A     That's right.

15       Q     Let's go back for a second.

16              Did your supervisors change at any time while

17    at Comcast?

18       A     When I worked at the front desk --

19       Q     Take it just as human resource clerk.  I'm sorry.

20       A     No, it did not.

21       Q     So when you left your employment with Comcast, who

22    was your supervisor?

23       A     Phil Mosley.

24       Q     When did that happen?  When did he become your

```
 1        A    I did not.

 2        Q    You did not?

 3        A    No.

 4        Q    So then I'll ask the question again.

 5             You continued to work.  Were you able to do

 6   your job?

 7        A    Yes, I was.

 8        Q    So you weren't given any work restrictions?

 9        A    No.

10        Q    He recommended that you not work but you were not

11   given any work restrictions?

12        A    No.

13        Q    And when was that when he recommended that you not

14   work?

15        A    This was when I first started having headaches in

16   2000.

17        Q    Now, let's fast forward to this 2002 period at the

18   time you told Mr. Mosley that you were having headaches.

19   Did you have any work restrictions then?

20        A    No.

21        Q    So you could do your job completely?

22        A    Yes.

23        Q    Focusing again on July of 2002 when you tell

24   Mr. Mosley about your headaches.  Did your headaches keep
```

1    you from doing any day-to-day activities?

2        A     A lot of times I couldn't exercise.  I used to like

3    to go to the fitness center at Comcast.  And I wasn't able

4    to exercise during that time.

5        Q     Anything else?

6        A     No.  You mean work-related?

7        Q     Yes.  Start with work-related.

8              Anything else?

9        A     No.

10       Q     All right.  Did your headaches impact your ability

11   to perform any other activities?

12       A     Personal activities?

13       Q     Sure.  Any day-to-day activities.

14       A     Yes.  I wasn't able to read, couldn't watch

15   television.  I wasn't able to sleep.  It was just a very

16   depressing, hurtful time in my life.

17       Q     All right.  Let's focus first on you weren't able to

18   read.  I asked you a while ago if you spent time on the

19   computer in your job as a human resource tech.  Do you

20   recall that?

21       A     Yes.

22       Q     And I asked you whether you spent up to three to six

23   hours a day on the computer reading.  And you recall telling

24   me yes?



```
1        A     Or answering e-mails or doing a spread sheet,

2    filling in information.

3        Q     So you could read all of that while at work every

4    day?

5        A     Yes.

6        Q     And that would be up to three to six hours?

7        A     Yes.

8        Q     And at work, could you write?

9        A     Yes.

10       Q     And you were able to use the computer all day long

11   at work?

12       A     Yes.

13       Q     Did you ever complain to a doctor that I guess we

14   are talking about being unable to read when not at work,

15   that you were struggling reading?

16       A     I don't recall mentioning that to my doctor.

17       Q     And what doctor would you have been seeing then?

18       A     Dr. Carunchio, my neurologist.

19       Q     You told us you were able to write at work, you were

20   able to read at work.  Did you have any trouble writing when

21   you were not at work?

22       A     I didn't -- when I wasn't at work, I didn't do

23   anything stressful.  I just wanted to be -- my mind to be

24   sharp when I went to work.  So I would go home and just, you
```

```
 1        A      My manager, Jim.  He was the manager for facilities.

 2   I can't remember his last name.

 3        Q      So Mr. Mosley.  But you have told us already that

 4   Mr. Mosley by July of 2002 was criticizing your work?

 5        A      That's right.

 6        Q      What was the reason you were given for your

 7   termination?

 8        A      Reorganization.

 9        Q      It wasn't that your work was poor?

10        A      I was given the excuse that it was reorganization.

11        Q      That was the explanation.  You called it an excuse.

12   That was the explanation, correct?

13        A      Yes.

14        Q      You also in that interrogatory response to paragraph

15   seven or number seven claimed that defendants admit

16   defendant Annone offered the plaintiff the opportunity for

17   job training after her termination but withdrew the offer

18   after she refused to sign their severance package, correct?

19        A      That's right.

20        Q      What exactly did Mr. Annone tell you?

21        A      After I left Comcast, after I was terminated, he

22   called me at home to inform me that there was a job seminar

23   down at C&E, they were having it at the C&E building, and he

24   was offering me to come and be a part of that.  And I said,
```

```
1     oh, that's fine, sounds really nice.
2               Then he called me back the next day and said,
3     oh, you know, you never signed that severance package.  So
4     unless you sign that, you won't be able to participate.
5        Q    Before you left Comcast, were you, in fact, offered
6     another position?
7        A    No, not that I can remember.
8        Q    You can't remember ever being offered a position as
9     a CAE or a customer account executive?
10       A    Oh, yes, that.
11       Q    You can recall being offered that?
12       A    Yes, I do.  .
13       Q    Sometimes that's referred to as a customer account
14    representative?
15       A    Um-hmm.
16       Q    And that was before you left the employ of Comcast,
17    correct?
18       A    That's right.
19       Q    And do you recall when you were being offered that
20    position that you were being offered that position with all
21    your benefits?
22       A    That was never discussed.
23       Q    Did anyone tell you your benefits would be taken
24    away from you in that position?
```

1      A      No.

2      Q      Do you recall being told that your salary would stay

3    the same?

4      A      That wasn't discussed.

5      Q      No one ever told you that it would be less, did

6    they?

7      A      No.

8      Q      So you had an opportunity in the fall and winter of

9    '02 to remain employed?

10      A      That's right.

11      Q      By Comcast?

12      A      That's right.

13      Q      And you turned that down, is that right?

14      A      I did.  I spoke to my sister.  She is a manager at

15    Comcast and she advised me not to take it because of the

16    kind of work that it was.  Also, Sandy Ricks told me it was

17    like being kicked in the face having to go back to a job

18    like that.  She was a CAE at one time.  She was also offered

19    it and she didn't accept it.

20      Q      What was Sandy's position?

21      A      She was a receptionist.

22      Q      So she rejected the opportunity to stay as an

23    employee of Comcast?

24      A      Yes.



```
1      A     Um-hmm.

2      Q     And by this time, your work was being heavily

3   criticized?

4      A     That's right.

5      Q     And did Mr. Annone say anything to you in response

6   to your mention to him that you were having headaches?

7      A     I don't recall that he did.

8      Q     Take a look at interrogatory nine.

9      A     Okay.

10     Q     You were asked to describe all facts in support of

11  your claim for wrongful termination.  And do you see what

12  your response was?  You refer to your answer above and you

13  also say, defendant fabricated reasons for firing plaintiff

14  including false claims she was not performing her job

15  satisfactorily.

16               Do you see that?

17     A     Yes, I do.

18     Q     You told us a little while ago that you were told

19  that the reasons for your termination was job elimination?

20     A     Um-hmm.  Yes.

21     Q     Comcast never told you that you were being fired for

22  poor work performance, did they?

23     A     Mr. Annone made it a big issue about my work

24  performance.
```



1    Q    And you say you can't remember specifically.  Can

2    you remember anything that they were telling you about poor

3    performance?

4    A    No.

5    Q    Who do you believe fabricated the reasons for

6    terminating?

7    A    I don't know.

8    Q    Do you believe Mr. Mosley fabricated the reasons

9    when he was being critical of your work?

10   A    I don't know.

11   Q    And when he was being critical of your work, he was

12   actually sharing with you specific criticisms, correct?

13   A    That's right.

14   Q    Did he discuss his criticisms with you?

15   A    Yes, he did.

16   Q    Did anyone else criticize your work?

17   A    No.

18   Q    But you believe that some criticisms came from

19   Ms. Pace?

20   A    That's right.

21   Q    And do you know what her criticisms were?

22   A    No.

23   Q    Do you believe that she was lying about her

24   criticisms?



```
1        A    I don't know.

2        Q    Do you know who made the decision to terminate your

3   employment?

4        A    No, I don't.

5        Q    Did anyone ever tell you your employment was being

6   terminated because of job performance?

7        A    I don't remember.  I can't remember.

8        Q    Who informed you that your employment was being

9   terminated?

10       A    Mr. Annone.

11       Q    Was it Mr. Annone who also offered you a position as

12  a CAE?

13       A    I think so.

14       Q    What exactly did Mr. Annone say to you when he told

15  you your position was being eliminated?

16       A    I don't know exactly what was said.  But when the

17  severance package was written up, it stated that it was due

18  to reorganization.

19       Q    You say you don't know exactly what he said to you.

20  Do you recall anything of what he said?

21       A    No.

22       Q    As far as you understood at the time, it was the

23  company's position that it was as a result of

24  reorganization?
```



```
1     A      I thought it was due to my poor work performance,

2   all the mistakes that they had the big folder on.

3     Q      That's what you thought?

4     A      Yes.

5     Q      Did anyone tell you that was the reason?

6     A      No.

7     Q      And Mr. Annone, when he met with you, actually told

8   you that it was because of job elimination, correct?

9     A      After the fact.

10    Q      And the paperwork also told you it was job

11  elimination, correct?

12    A      That's right.

13    Q      And you later found out that Sandy Ricks' position

14  was also eliminated, correct?

15    A      That's right.

16    Q      And you can't tell us what Mr. Annone said to you?

17    A      I can't remember.  I'd rather not guess.

18    Q      But you do acknowledge that no one, including

19  Mr. Mosley and Mr. Annone, ever told you it was because of

20  job performance?

21    A      I can't remember.

22    Q      But you do acknowledge also that they were giving

23  you the opportunity to continue to work?

24    A      After the fact.
```



```
 1      Q    What do you mean after the fact?

 2      A    After I had informed them that I had an attorney.

 3      Q    But you were still employed there, correct?

 4      A    Yes.

 5      Q    And they offered you the position of CAE?

 6      A    Yes, sir.

 7      Q    When did you retain counsel?

 8      A    I believe it was in September.  In September of '02.

 9      Q    Do you remember when in September of '02?

10      A    No.

11      Q    Who do you claim that you told that you retained

12   counsel?

13      A    Mr. Annone.

14      Q    And when did you tell Mr. Annone that you retained

15   counsel?

16      A    I don't know the exact date.

17      Q    Do you know where you were when you told him?

18      A    In his office.

19      Q    And what occasioned you to be in his office?

20      A    I don't know.

21      Q    Did you go in there just to tell him that you had

22   hired a lawyer?

23      A    No.

24      Q    What prompted you to tell him you had hired a
```

```
1      lawyer?
2          A     During the conversation -- during that time, I was
3      in and out of his office and Mr. Mosley's office.  But I
4      don't know what prompted me to tell.
5          Q     Did you tell Mr. Mosley that you had retained a
6      lawyer?
7          A     I don't believe I did.
8          Q     Did you send any letters to Comcast that you had
9      retained a lawyer?
10         A     No.
11         Q     And the reason you turned down the customer service
12     representative position, that CAE position, it's called a
13     couple of different things, is because of what you say your
14     sister advised you to do, correct?
15         A     That's right.
16         Q     Who offered you the position?
17               MR. BARTOSHESKY:  Objection.  Asked and
18     answered at least twice I think now.
19               MR. LANGEL:  You can answer.
20               THE WITNESS:  I believe it was Mr. Annone.
21     BY MR. LANGEL:
22         Q     And why do you believe the customer service
23     representative position, the CAE position, would have been
24     more pressure and stress?
```



```
 1     you had started before July 19th?

 2         A     That's right.

 3         Q     And prepare new hire packets.  Is that additional

 4     responsibility, too?

 5         A     Yes.

 6         Q     And prepare new hire personal folders?

 7         A     Yes.

 8         Q     Are those all in connection with Bethany Pace?

 9         A     Yes.

10         Q     And post HR tracking data?

11         A     Yes.

12         Q     Is that Bethany Pace as well?

13         A     Yes.  All these are Bethany Pace.

14         Q     Any other new responsibilities?

15         A     No.  The PAN forms were assigned to me before

16     Bethany Pace's additional responsibilities.

17         Q     So even before the July 19th date, you had the PAN

18     form responsibilities?

19         A     Yes.

20         Q     And tell us again, when would you do this additional

21     work?  Would you take it home at night?

22         A     The work that I could take home, I would take home.

23     Like the PAN forms.  If we were starting a new hire class,

24     say like Monday, I might take things home on Friday so that
```

```
1      everything would be together, the folders would be together

2      and ready to give out.

3        Q    And when you got home, when did you leave work?

4        A    At 5:00 o'clock.

5        Q    And when would you get home?

6        A    Maybe 6:00.  It depended on the traffic.

7        Q    And when would you start doing the work?

8        A    After dinner.

9        Q    And what time would dinner be?

10       A    I would probably start them about 7:00, 7:30.

11       Q    What time did your husband come home from work?

12       A    I believe it was 4:30.  He got off at 4:00 o'clock.

13       Q    And would he cook dinner every night?

14       A    Yes.

15       Q    You never cooked?

16       A    Not during the week, I didn't.  On the weekends, I

17     did.

18       Q    So on the weekends, you continued to cook?

19       A    Yes.

20       Q    When did you stop cooking during the week?

21       A    I would say it was probably around the time my

22     headaches started getting worse.

23       Q    And when was that?

24       A    This was in around July.
```



```
1        A     Maybe three.

2        Q     All right.

3        A     And I'm guessing.

4        Q     Every week you worked at home three nights a week?

5        A     Or maybe more.

6        Q     All right.  So at least it was three nights a week,

7   you would leave work at 5:00, you get home by 6:00, you

8   would have dinner and three nights a week you would be up

9   late working?

10       A     Yes.  But I'm not sure if it was more than three

11  nights or less.  It depended.

12       Q     Was it an average of three times a week?

13       A     I would say about an average.

14       Q     And that would be every week?

15       A     During that period, yes.

16       Q     When you say during that period, describe the

17  period.  How often would this happen?

18       A     When I got the extra work.

19       Q     All right.  So from the time Michael Patterson gives

20  you these PAN forms to start doing until you leave

21  employment, you would be up working a minimum of three times

22  a week or an average of at least three times a week until

23  11:00 o'clock at night?

24       A     And I didn't take the PAN forms home until I got
```

```
 1      these additional responsibilities.  Because I was fine.  I
 2      was able to do the PAN forms at work.
 3          Q     Okay.
 4          A     And everything else I was doing.
 5          Q     So after you get these additional responsibilities,
 6      which was sometime after Michelle leaves?
 7          A     Yes.
 8          Q     You're working an average of three nights a week at
 9      home?
10          A     About that, yes.
11          Q     So you would work all day?
12          A     Sometimes --
13          Q     And also have to work at night?
14          A     Even my lunch hours there were times when I didn't
15      even take a lunch hour.
16          Q     And you also worked weekends?
17          A     Not every weekend.  But I do recall on occasion I
18      would, on my way home from church, I would go to work and
19      work the whole afternoon.
20          Q     And what would the time frame have been for you to
21      be working weekends?
22          A     Probably -- we got out of church at 1:30.  About
23      2:00 to 5:00.
24          Q     And how often?
```



1    Michelle leaves and you get these additional

2    responsibilities and you leave employment?

3        A    That's all I can remember.

4        Q    And those would be on Sundays for a few hours?

5        A    On Sundays.  On one particular day, I think it was a

6    Saturday, Laurie Lavinson was -- she was in doing some work

7    also.  So we were in the office together.  And I would also

8    go in.  I would close the HR door because if the door was

9    open, the employees would think that they could come in.  So

10   I would be sitting in there by myself sometimes with the

11   door closed working away.

12       Q    And this would involve reading?

13       A    Mostly computer work.

14       Q    Right.  You would have to read the computer?

15       A    Um-hmm.

16       Q    And writing?

17       A    Yes.

18       Q    And the work you had to do at home at night, would

19   that involve reading?

20       A    Yes.

21       Q    And writing?

22       A    Um-hmm.

23       Q    This document that I have given you that has been

24   marked as Parker 7, when was it created?

1    but every opportunity I had, I would write in my journal.

2        Q     Why?

3        A     Because it would help me to not concentrate on my

4    pain.  The writing helped me.

5        Q     And tell us the process that you followed?  Because

6    you just said you wouldn't do it every day, you would do it

7    some days?

8        A     It would depend on how I was feeling that particular

9    day.  If I was in a lot of pain physically or emotionally, I

10   would write, take my mind off of my pain.

11                   MR. LANGEL:  Let's mark your journal that you

12   produced as 11.

13                        (Parker Deposition Exhibit No. 11 was

14   marked for identification.)

15   BY MR. LANGEL:

16       Q     Do you see that, what I just gave you?

17       A     Um-hmm.  Yes.

18       Q     I represent to you that that's a copy of what you

19   gave to us.  Is that a full copy of the journal that you

20   kept?

21       A     Yes, it is.

22       Q     Just so I can understand the process.  Turn to

23   what's marked as page two.

24       A     Okay.



```
1     eliminate me, that it caused me to have greater headaches.

2          Q    So you're not claiming, then, that Comcast fired you

3     because you had chronic headaches?

4          A    I don't know.  I really don't know why.  I really

5     don't know why they fired me.

6          Q    At least you allege in the complaint that they were

7     firing you because you had chronic headache.

8               My question is, if they were firing you because

9     you had chronic headaches, why would Mr. Annone be

10    encouraging you to post for another position?

11         A    You'll have to ask him that.

12         Q    And why would he be offering you another position as

13    a CAE?

14         A    He offered me a position after I told him that I had

15    an attorney.

16         Q    I understand that.  But if they were firing you

17    because of your chronic headaches, why would he be

18    encouraging you to post for a position?

19         A    I'm assuming that he knew that I would not take the

20    job like that because it would be much -- too much stress.

21         Q    Yeah, but to post for a position wasn't even limited

22    to a CAE position?

23         A    That's the only one that he said I could apply for.

24         Q    Yeah, but when you went to him, you just wanted to
```

```
1     know whether you could post for another position?

2         A     That's right.

3         Q     Correct?

4         A     That's right.

5         Q     And he was encouraging?

6         A     Yes.

7         Q     All right.  And that was sometime around the 8th,

8     9th, or 10th of September where you told him you wanted to

9     post and he was encouraging?

10        A     I don't remember the exact date.

11        Q     Well, this memo was September 9th and it refers to

12    three dates, 8, 9 and 10?

13                MR. BARTOSHESKY:  Objection to form.

14                THE WITNESS:  The September 9th is just my --

15    the name I put in the computer so I could identify this

16    document.

17    BY MR. LANGEL:

18        Q     We'll try it a different way, then.

19                Page two, the third full paragraph that starts,

20    prior to going on vacation.

21        A     Um-hmm.

22        Q     I asked Phil Annone if I could post for employment

23    within the company.  You write, I could tell that he was not

24    in favor of that but he told me to let him know if he could
```

```
 1    office knew that I was sick.  The whole office.  But they
 2    continued with the harassment.  They continued with the
 3    overload of work.  It didn't stop.  It just continued.  And
 4    I just came to a point where I said I can't do this anymore,
 5    I can't stay here anymore.
 6         Q    You say you can't do this anymore, you can't stay
 7    here anymore.  You were doing your work, correct?
 8         A    I was doing the best I could.
 9         Q    You thought you were doing a good job?
10         A    I was doing the best I could with all the work that
11    I had.
12         Q    And you were doing that work during the day and at
13    home at night?
14         A    Some of it at night, yes.
15         Q    Did you ever ask Mr. Mosley to let up on the amount
16    of work he was giving you?
17         A    To let up?
18         Q    Yeah.
19         A    No.
20         Q    Did you ever tell Mr. Mosley or Mr. Annone or
21    Ms. Pace or anyone else that the amount of work they were
22    giving you was increasing your headaches?
23         A    I didn't.  I was afraid.  I just tried to do all the
24    work because I didn't want to lose my job.  I didn't want to
```

1           Who do you claim told you that?

2      A    Mr. Annone.

3      Q    So when you say defendants, you only mean Mr.

4  Annone?

5      A    Yes.

6      Q    Paragraph 22 says that on November 4th, 2002,

7  plaintiff's employment was terminated purportedly for poor

8  job performance.

9      A    Well, they were criticizing my work.  But, at the

10  same time, they were saying we are reorganizing.

11     Q    Go ahead.

12     A    And that was the reason why they were letting me go.

13     Q    In fact, you were told it was because of

14  reorganization and not your job performance, correct?

15     A    That's what I was told.

16     Q    Why do you allege that you were terminated for poor

17  job performance?

18     A    Because of all the complaints, you know, that

19  everyday nit-picking and everything that I was doing wrong.

20     Q    But, in fact, they told you it wasn't for poor job

21  performance, correct?

22     A    Yes, they did.

23     Q    All right.  And no one at Comcast ever told you you

24  were being terminated for poor job performance, correct?

1      A     That's right.

2      Q     Who exactly is it at Comcast who you believe

3      discriminated against you and terminated you because of

4      headaches?

5      A     I'm not saying I was terminated because of

6      headaches.   I'm saying that I had headaches, and because of

7      all the interrogation, all the harassment, all the extra

8      work, it just made me sicker because I already had the

9      headaches.   It just made it worse.

10     Q     Okay.   Do you know whether there were any other

11     positions that were eliminated at the time that your

12     position was eliminated?

13     A     Sandy.

14     Q     Just Sandy's?

15     A     Sandy.   There was a lot of team leaders that were.

16     But I don't know if it was the same time that I was let go.

17     Q     Around that time?

18     A     I don't know.   I'm not sure of the date but I know

19     there was a lot of team leaders that lost their jobs.

20     Q     Do you know whether your job still exists at

21     Comcast?

22     A     I don't.

23     Q     Are you working now?

24     A     Yes, I am.

1    Comcast, correct?

2        A    That's right.

3        Q    Are you better today?

4        A    Not today.

5        Q    Do you feel better since you left Comcast?

6        A    Physically?

7        Q    Physically and mentally since you left Comcast.

8        A    I would say yes.

9        Q    So emotionally, other than the stress of having to

10   go through this deposition today, you feel better?

11       A    I do.

12       Q    You feel healthier mentally?

13       A    I do, yes.

14       Q    And you feel healthier physically?

15       A    I do still have headaches.  I'm still on medication.

16   But I'm not stressed on the job.

17       Q    Does your medication that you take relieve you of

18   headaches?

19       A    The Zomig does.  That helps.  I don't take that

20   every day.  I take the Amitriptyline every night.  I take it

21   at night because it does make you drowsy and dizzy and it's

22   supposed to control the head pain.

23       Q    And when you were at Comcast, did you take these

24   medicines?



1      A      Yes, I did.

2      Q      And did they make you feel better?

3      A      Somewhat.  Like the Amitriptyline doesn't get rid of

4    headache altogether.  It just makes it mild.  Kind of

5    sedated.

6      Q      It allows you to do your work better?

7      A      Yes.

8      Q      Allows you to read a computer monitor better?

9      A      Yes.

10     Q      Allows you to read better?

11     A      Yes.

12     Q      With the medication, can you watch TV and things

13   like that?

14     A      Certain times.  Like if I'm having a migraine, I

15   can't.

16     Q      Oh, I understand migraines.  I get migraines.

17            So other than when you're getting a migraine,

18   the medicines you take allow you to watch TV?

19     A      It does, yes.

20     Q      And movies?

21     A      Yes.

22     Q      And cook?

23     A      I'm better.

24     Q      And clean?

```
 1      A    Yes.

 2      Q    And when you were at Comcast, the medicines you

 3   took, did they allow you to do that work that you were doing

 4   at night?

 5      A    I do it because I had to.  I was fighting for my

 6   job.  I'm not saying I felt better physically because I

 7   wasn't having any pain.  I was fighting for my job.

 8      Q    The medicines helped, though?

 9      A    I think they helped.

10      Q    You mentioned that you weren't seeing any doctors

11   currently, correct?

12      A    I am not.

13      Q    Is that because you're feeling better?

14      A    No.  My benefits won't cover my doctor visits.

15      Q    What will your benefits cover?

16      A    My benefits are only for sick and accident.  It

17   doesn't cover any pre-existing illnesses.  So I don't go see

18   Dr. Carunchio anymore.

19      Q    Did you ever go look for a job that would cover

20   pre-existing illnesses?

21      A    No.

22      Q    How do you get your prescriptions?

23      A    I pay for them.

24      Q    Who prescribes them if you don't see a doctor?
```

```
 1      Q     He tells me it's kept incredibly neatly.  Would you
 2    agree with that?
 3      A     Yes.
 4      Q     You're a bit of a neat freak?
 5      A     I'm afraid so.
 6      Q     What about your husband?  Is he as neat a freak as
 7    you?
 8      A     Yeah, he is.  I couldn't live with a sloppy man.
 9      Q     And through the time at Comcast in July and August
10    and September and October until you leave, did your house
11    stay neat?
12      A     Yes.
13      Q     Was that somewhat as a result of your efforts?
14      A     During the time when I was really going through, my
15    husband did most of the work.  He did the cooking, the
16    laundry, the shopping.  He just did everything because I
17    wasn't able to do it.
18      Q     You say you weren't able to do it.  But this
19    confuses me a bit.  You were able to work at least three
20    nights a week at home?
21      A     I had to do it.
22      Q     So in place of doing the cooking and cleaning, you
23    were able to do work at home?
24      A     Yes.  By him doing that, it gave me time to do it,
```

1       the strength to do it.

2           Q    Okay.  If you didn't have to work at home, you would

3       have been able to do it?

4           A    If I didn't have to work. --

5           Q    If you didn't have to do the PAN's at home, you

6       would have been able to cook and clean and do those things?

7           A    No, I wouldn't have been able to do it.

8           Q    You could work but not clean?

9           A    It was awful.  I mean my headaches were so bad, I

10      couldn't do anything.

11          Q    How could you work?

12          A    I just did.  Sheer willpower.

13          Q    So you could work?

14          A    Yes.  You make yourself do what you have to do.

15          Q    So why do you say you couldn't have cleaned?

16          A    Because I would be so tired when I would get off

17      from work.

18          Q    You wouldn't be so tired that you couldn't work?

19          A    Work comes first.

20          Q    All right.  If you didn't have to work, could you

21      have done other things?

22          A    Yes.

23          Q    Okay.  And those other things would be like cooking

24      and cleaning and those things?

**W&F**

**WILCOX & FETZER LTD.**
Registered Professional Reporters

ERNESTINE PARKER                                    206

1        A     Yes.

2        Q     Your answer to that was yes?

3        A     Yes.

4        Q     And how soon after you left Comcast were you able to

5     now do cooking and cleaning and those things?

6        A     I was better even before I left Comcast because

7     things was normal again.

8        Q     All right.  So when you had less stress at work, you

9     immediately were able to do those things at home?

10       A     I was better.  I was much better.

11       Q     So the period of time where you were not able to do

12    those things was from the period of time where you got

13    Michelle's duties?

14       A     Yes.  In that time.

15       Q     Until you no longer had Michelle's duties?

16       A     Before then, I was doing the work.  I wasn't

17    stressed.  It was a nice atmosphere to work in.  Everybody

18    got along.  It was nice.

19       Q     So those increased duties interfered with --

20       A     The increased duties and just the nit-picking, you

21    know, to complain about the size of an envelope that you put

22    a letter in, that's nit-picking.  That's minor.  I never

23    made any mistakes when I did the PAN forms.  I just took my

24    time and made sure that the calculations were correct.  So