# EXHIBIT C



**WILCOX & FETZER LTD.**

In the Matter Of:

# Parker

v.

# Comcast Corporation, et al.

C.A. # 04-344 KAJ

---

Transcript of:

Philip Annone

October 26, 2005

---

Wilcox & Fetzer, Ltd.
Phone: 302-655-0477
Fax: 302-655-0497
Email: lhertzog@wilfet.com
Internet: www.wilfet.com

Parker                              v.                      Comcast Corporation, et al.
Philip Annone                C.A. # 04-344 KAJ                    October 26, 2005

Page 1

```
             IN THE UNITED STATES DISTRICT COURT
                 FOR THE DISTRICT OF DELAWARE

ERNESTINE PARKER,                    )
                                     )
             Plaintiff,              )
                                     )   Civil Action
    v.                               )   No. 04-344 KAJ
                                     )
COMCAST CORPORATION, a               )
Pennsylvania corporation, COMCAST    )
CABLE COMMUNICATIONS, INC., a        )
Delaware corporation, COMCAST        )
CABLEVISION OF NEW CASTLE            )
COUNTY, LLC, a Delaware Limited      )
Liability Corporation, successor     )
in interest to Comcast Cablevision   )
of New Castle County, Inc., a        )
Delaware corporation, PHILIP         )
ANNONE and WILLIAM G. MOSLEY,        )
                                     )
             Defendants.             )
```

Deposition of PHILIP ANNONE taken pursuant to notice at the law offices of Biggs & Battaglia, 921 Orange Street, Wilmington, Delaware, beginning at 12:40 p.m. on Wednesday, October 26, 2005, before Kurt A. Fetzer, Registered Diplomate Reporter and Notary Public.

APPEARANCES:

    VICTOR F. BATTAGLIA, SR., ESQ.
    PHILIP B. BARTOSHESKY, ESQ.
    BIGGS & BATTAGLIA
      921 Orange Street
      Wilmington, Delaware  19801
      For the Plaintiff
          WILCOX & FETZER
1330 King Street - Wilmington, Delaware 19801
          (302) 655-0477

Parker v. Comcast Corporation, et al.
Philip Annone          C.A. # 04-344 KAJ          October 26, 2005

### Page 2

```
 1  APPEARANCES: (Cont'd)
 2     JOHN B. LANGEL, ESQ.
        FARRAH I. GOLD, ESQ.
 3     BALLARD SPAHR ANDREWS & INGERSOLL, LLP
        1735 Market Street - 51st Floor
 4      Philadelphia, Pennsylvania 19103-7599
        for the Defendants
 5
    ALSO PRESENT:
 6     ERNESTINE PARKER
 7     DAVID BRIER, ESQ. -
        COMCAST CABLE COMMUNICATIONS, LLP
 8
        BILLY G. MOSLEY
 9          - - - - -
10          PHILIP ANNONE,
11   the deponent herein, having first been
12   duly sworn on oath, was examined and
13   testified as follows:
14          MR. LANGEL: So I don't have to remember
15   at the end, we will also read and sign this.
16          EXAMINATION
17   BY MR. BATTAGLIA:
18   Q. Your full name, please, for the record?
19   A. Philip Thomas Annone.
20   Q. What is your occupation, please, Mr. Annone?
21   A. I work in human resources.
22   Q. And what's your title or position?
23   A. Director of human resources.
24   Q. For what company, please?
```

### Page 3

```
 1  A. For the New Castle call center for Comcast.
 2  Q. Comcast. How long have you been employed
 3  there?
 4  A. About four years.
 5  Q. Did you start there in February of 2001?
 6  A. I did.
 7  Q. What is your educational background, please?
 8  A. I have a college degree, a bachelor's degree,
 9  and I have a master's degree.
10  Q. Where is your bachelor's degree from, please?
11  A. It's from Lynn University.
12  Q. That's in Florida, as I recollect?
13  A. That is correct.
14  Q. And your master's degree?
15  A. Is from Wilmington College.
16  Q. When was your master's degree granted, please?
17  A. I believe it was in 2001.
18  Q. Month?
19  A. I'm not exactly sure.
20  Q. And in October 2001 you started with Comcast as
21  the HR director?
22  A. Yes. That is correct.
23  Q. Of the New Castle call center?
24  A. Of the New Castle call center.
```

### Page 4

```
 1  Q. To whom did you report?
 2  A. At the time?
 3  Q. Yes.
 4  A. When I started?
 5  Q. Yes, please.
 6  A. I had two reports. I reported into Barbara
 7  Edwards at the New Castle call center and I reported
 8  into an HR VP at the time, who was I believe it was
 9  Jim Sullivan.
10  Q. What was Ms. Edwards' position, please, sir?
11  A. I'm not exactly sure of her exact title. I
12  believe she was the -- I'm not sure. I don't know if
13  she was a director or VP. I'm not quite sure. I
14  don't know.
15  Q. Were there employees who reported to you at the
16  time of the inception of your employment with Comcast
17  in New Castle?
18  A. Yes, there was.
19  Q. Who were they, please?
20  A. Angela Wilson, Donna Minor, Kara Pietrowicz,
21  Ernestine Parker, Sandy Ricks, Edwin Gonzalez and
22  Alberina -- I'm not exactly sure of the pronunciation.
23  Q. Ziemba?
24  A. Ziemba.
```

### Page 5

```
 1  Q. How about Ozoria Holman, did she report to you
 2  too?
 3  A. No. At first the payroll department, she was
 4  part of payroll and payroll did not report directly
 5  into me at first.
 6  Q. To whom did she report?
 7  A. I'm not sure where payroll started off with.
 8  Q. Did there come a time when she was part of your
 9  report group?
10  A. There was a time where she was part of my
11  report group.
12  Q. Were any of those people hired by you?
13  A. No, they were not.
14  Q. Did you have authority to hire and fire?
15  A. I'm not exactly sure what you mean by
16  "authority."
17  Q. Beg your pardon?
18  A. I'm not exactly sure what you mean by
19  "authority." It wasn't my sole, I didn't have sole
20  authority to hire and fire.
21  Q. Tell us what role you played in the hiring and
22  firing of employees, to make it easy.
23  A. Sure. As the human resources director, I would
24  provide in certain circumstances advice or counsel to
```

2 (Pages 2 to 5)

Wilcox & Fetzer, Ltd.          Professional Court Reporters          (302)655-0477

Page 30

1  happened or if I found out the next day. I don't
2  recall. I really can't remember.
3       For some reason I don't think that I was
4  there or I was in meetings all day and came back to
5  hear something. I can't recall unfortunately is the
6  answer.
7  Q. Did you ever learn what caused her to collapse?
8  A. Did I ever?
9  Q. Yes.
10 A. Yes.
11 Q. What did you learn?
12 A. She had headaches.
13 Q. Okay. Now, is there a Comcast safety policy
14 that requires when a worker becomes injured or sick on
15 the job that they're subject to a 911 telephone call
16 for emergency help?
17 A. I don't know. I'm not sure. I'm not aware of
18 that policy, no.
19 Q. You don't know.
20 A. I don't know.
21 Q. Why was Ernestine Parker terminated?
22 A. Her position was eliminated, along with other
23 administrative roles within the New Castle call
24 center.

Page 31

1  Q. And was that pursuant to some plan or
2  organization?
3  A. Was that pursuant to some plan?
4  Q. Yes. Was the termination of her job pursuant
5  to some plan or organization or reorganization?
6  A. To answer your question, there was no -- what
7  happened was it was a result of a budget meeting with
8  some of the senior folks in the center who were
9  looking at ways of cutting costs in operations and
10 creating efficiencies in the call center and that's
11 how the process began.
12 Q. Was there anything in writing that described
13 how her workload would be distributed?
14 A. Boy, I really don't know.
15 Q. Not that you're aware of then?
16 A. Not that I'm aware of.
17 Q. How did you become aware of these budget
18 discussions?
19 A. I believe Mr. Fidel Edwards, vice president of
20 the call center, and/or Brian Lambert, area vice
21 president, asked for my advice as the HR director on
22 the restructuring or reorganization of the
23 administrative roles.
24 Q. And what did that have to do with Ernestine

Page 32

1  Parker?
2  A. She was in an administrative role.
3  Q. So is it your testimony that there was a
4  restructuring?
5  A. No. There was elimination of the
6  administrative positions and then I as an opportunity
7  of that had decided to change the outlook of the human
8  resource department.
9  Q. Was there anything in writing that described a
10 plan to eliminate those positions?
11 A. I believe I had a document that I provided to
12 Mr. Fidel Edwards that provides a recommendation.
13 Q. That she be terminated?
14 A. No. That the administrative roles in the call
15 center be eliminated and that we take an opportunity
16 to hire a professional, skilled HR generalist or HR
17 administrator.
18 Q. When Ernestine Parker was terminated who did
19 the work that she was doing?
20 A. I believe that role was split up amongst
21 different people.
22 Q. Who was it split among?
23 A. I believe the whole team shared some different
24 pieces of the responsibility. Ernestine Parker did a

Page 33

1  lot of filing which we all took on our own filing.
2  She did some programs that some were disseminated to
3  benefits, some were disseminated to HR generalists,
4  things of that nature.
5  Q. Is there a writing somewhere that describes the
6  dissemination of that work?
7  A. Not to my knowledge.
8  Q. How was it accomplished? I mean, did you just
9  go around and tell people you're going to do
10 such-and-such?
11     How were people made aware that they were
12 going to be required to do things that Ernestine
13 Parker had done before she left?
14 A. I can't recall. I don't know.
15 Q. How many employees are there in the HR
16 department now in which Ernestine Parker was employed
17 before she was terminated?
18 A. The question is how many employees are
19 currently working in HR at the New Castle call center?
20 Q. Yes, sir.
21 A. Including myself?
22 Q. Including yourself, if you work there.
23 A. Yes. Sorry. Eight. I apologize.
24 Q. How many were there when Ms. Parker worked

Page 30

1 happened or if I found out the next day. I don't
2 recall. I really can't remember.
3     For some reason I don't think that I was
4 there or I was in meetings all day and came back to
5 hear something. I can't recall unfortunately is the
6 answer.
7 Q. Did you ever learn what caused her to collapse?
8 A. Did I ever?
9 Q. Yes.
10 A. Yes.
11 Q. What did you learn?
12 A. She had headaches.
13 Q. Okay. Now, is there a Comcast safety policy
14 that requires when a worker becomes injured or sick on
15 the job that they're subject to a 911 telephone call
16 for emergency help?
17 A. I don't know. I'm not sure. I'm not aware of
18 that policy, no.
19 Q. You don't know.
20 A. I don't know.
21 Q. Why was Ernestine Parker terminated?
22 A. Her position was eliminated, along with other
23 administrative roles within the New Castle call
24 center.

Page 31

1 Q. And was that pursuant to some plan or
2 organization?
3 A. Was that pursuant to some plan?
4 Q. Yes. Was the termination of her job pursuant
5 to some plan or organization or reorganization?
6 A. To answer your question, there was no -- what
7 happened was it was a result of a budget meeting with
8 some of the senior folks in the center who were
9 looking at ways of cutting costs in operations and
10 creating efficiencies in the call center and that's
11 how the process began.
12 Q. Was there anything in writing that described
13 how her workload would be distributed?
14 A. Boy, I really don't know.
15 Q. Not that you're aware of then?
16 A. Not that I'm aware of.
17 Q. How did you become aware of these budget
18 discussions?
19 A. I believe Mr. Fidel Edwards, vice president of
20 the call center, and/or Brian Lambert, area vice
21 president, asked for my advice as the HR director on
22 the restructuring or reorganization of the
23 administrative roles.
24 Q. And what did that have to do with Ernestine

Page 32

1 Parker?
2 A. She was in an administrative role.
3 Q. So is it your testimony that there was a
4 restructuring?
5 A. No. There was elimination of the
6 administrative positions and then I as an opportunity
7 of that had decided to change the outlook of the human
8 resource department.
9 Q. Was there anything in writing that described a
10 plan to eliminate those positions?
11 A. I believe I had a document that I provided to
12 Mr. Fidel Edwards that provides a recommendation.
13 Q. That she be terminated?
14 A. No. That the administrative roles in the call
15 center be eliminated and that we take an opportunity
16 to hire a professional, skilled HR generalist or HR
17 administrator.
18 Q. When Ernestine Parker was terminated who did
19 the work that she was doing?
20 A. I believe that role was split up amongst
21 different people.
22 Q. Who was it split among?
23 A. I believe the whole team shared some different
24 pieces of the responsibility. Ernestine Parker did a

Page 33

1 lot of filing which we all took on our own filing.
2 She did some programs that some were disseminated to
3 benefits, some were disseminated to HR generalists,
4 things of that nature.
5 Q. Is there a writing somewhere that describes the
6 dissemination of that work?
7 A. Not to my knowledge.
8 Q. How was it accomplished? I mean, did you just
9 go around and tell people you're going to do
10 such-and-such?
11     How were people made aware that they were
12 going to be required to do things that Ernestine
13 Parker had done before she left?
14 A. I can't recall. I don't know.
15 Q. How many employees are there in the HR
16 department now in which Ernestine Parker was employed
17 before she was terminated?
18 A. The question is how many employees are
19 currently working in HR at the New Castle call center?
20 Q. Yes, sir.
21 A. Including myself?
22 Q. Including yourself, if you work there.
23 A. Yes. Sorry. Eight. I apologize.
24 Q. How many were there when Ms. Parker worked