# EXHIBIT D



**WILCOX & FETZER LTD.**

In the Matter Of:

# Parker

v.

# Comcast Corporation, et al.

C.A. # 04-344 KAJ

Transcript of:

Billy G. Mosley

October 26, 2005

Wilcox & Fetzer, Ltd.
Phone: 302-655-0477
Fax: 302-655-0497
Email: lhertzog@wilfet.com
Internet: www.wilfet.com

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

ERNESTINE PARKER,                  )
                                   )
          Plaintiff,               )
                                   )  Civil Action
     v.                            )  No. 04-344 KAJ
                                   )
COMCAST CORPORATION, a             )
Pennsylvania corporation, COMCAST  )
CABLE COMMUNICATIONS, INC., a      )
Delaware corporation, COMCAST      )
CABLEVISION OF NEW CASTLE          )
COUNTY, LLC, a Delaware Limited    )
Liability Corporation, successor   )
in interest to Comcast Cablevision )
of New Castle County, Inc., a      )
Delaware corporation, PHILIP       )
ANNONE and WILLIAM G. MOSLEY,      )
                                   )
          Defendants.              )

          Deposition of BILLY G. MOSLEY taken
pursuant to notice at the law offices of Biggs &
Battaglia, 921 Orange Street, Wilmington, Delaware,
beginning at 10:10 a.m., on Wednesday, October 26,
2005, before Kurt A. Fetzer, Registered Diplomate
Reporter and Notary Public.

APPEARANCES:

     VICTOR F. BATTAGLIA, SR., ESQ.
     PHILIP B. BARTOSHESKY, ESQ.
     BIGGS & BATTAGLIA
       921 Orange Street
       Wilmington, Delaware  19801
       For the Plaintiff
             WILCOX & FETZER
     1330 King Street - Wilmington, Delaware 19801
                  (302) 655-0477

| Parker | v. | Comcast Corporation, et al. |
|---|---|---|
| Billy G. Mosley | C.A. # 04-344 KAJ | October 26, 2005 |

Page 2

1  APPEARANCES: (Cont'd)
2      JOHN B. LANGEL, ESQ.
       FARRAH I. GOLD, ESQ.
3      BALLARD SPAHR ANDREWS & INGERSOLL, LLP
       1735 Market Street - 51st Floor
4      Philadelphia, Pennsylvania 19103-7599
       for the Defendants
5
   ALSO PRESENT:
6      ERNESTINE PARKER
7      DAVID BRIER, ESQ. -
       COMCAST CABLE COMMUNICATIONS, LLP
8
       PHILIP ANNONE
9          - - - - -
10          BILLY G. MOSLEY,
11     the deponent herein, having first been
12     duly sworn on oath, was examined and
13     testified as follows:
14          EXAMINATION
15 BY MR. BATTAGLIA:
16   Q. Would you state your full name for the record,
17 please, sir?
18   A. It's Billy G. Mosley.
19   Q. And where do you live, please?
20   A. I live in Middletown, Delaware.
21   Q. Mr. Mosley, have you ever been deposed before?
22   A. Yes.
23   Q. Then you know the rules, that you have to
24 respond audibly and you can't just shake your head

Page 3

1 like you're doing right now, right?
2   A. Yes.
3   Q. By whom are you employed?
4   A. Comcast Cable of New Castle, Delaware.
5   Q. What is your title or position?
6   A. Human resource manager.
7   Q. Have you had any college education?
8   A. Yes.
9   Q. Would you tell us what it is, please, sir?
10   A. Two-and-a-half years of majoring in accounting,
11 University of Arkansas, Pine Bluff.
12   Q. Any college beyond that?
13   A. No. Just leadership training.
14   Q. All right. And where did you work before you
15 went to work for Comcast?
16   A. I worked for myself. I worked for myself for a
17 year and a half as an independent consultant.
18   Q. What was the nature of your business?
19   A. Leadership training, customer service training,
20 diversity training.
21   Q. And give me some idea of what you did on a
22 day-to-day basis when you were working for yourself.
23 I'm trying to find out what your job consisted of.
24   A. I would go into First Union. I will give you

Page 4

1 an example. First Union Bank, I would go in and go
2 through customer service training, help tellers and
3 other employees focus more on servicing the customers,
4 how to understand and better interact with the
5 customer, make sure that the customer felt at ease
6 when they walked into the institution.
7   Q. Did you have any special training that
8 qualified you to do that?
9   A. Yes, I did. I worked for CoreStates Bank for
10 23 years. I was a vice president for CoreStates Bank.
11       Also, I am a certified diversity trainer
12 consultant.
13   Q. I'm sorry? A certified?
14   A. Diversity trainer consultant.
15   Q. By whom were you certified?
16   A. CoreStates Bank.
17   Q. How did you happen to land at Comcast?
18   A. I applied for Comcast. I was looking for a
19 position and I saw the position on monster.com and I
20 applied for the position.
21   Q. Did the advertisement for the position indicate
22 that a college degree was required?
23   A. I don't believe so.
24   Q. Were you actively recruited for the position or

Page 5

1 did you apply of your own?
2   A. I applied on my own.
3   Q. Had you had any prior experience working in an
4 HR atmosphere?
5   A. Yes. I worked for CoreStates Bank. I had 15
6 years working in HR.
7   Q. What was your title at CoreStates?
8   A. I was vice president, vice president, human
9 resource manager.
10   Q. Who was your immediate supervisor at
11 CoreStates?
12   A. My last supervisor I believe was Randy Cohen.
13   Q. Was that in Philadelphia?
14   A. Yes. Randy is in Philadelphia.
15   Q. Now, can you describe the process which took
16 place that resulted in your being hired at the New
17 Castle call center? By that I mean you saw the ad.
18 You applied somewhere.
19       What happened after that?
20   A. I received a phone call from a young woman, I
21 believe her name was Samantha. I forget Samantha's
22 last name. But she called and initially gave me a
23 phone screening.
24       The next day I came in and interviewed

2 (Pages 2 to 5)

Wilcox & Fetzer, Ltd.          Professional Court Reporters          (302)655-0477

| Parker<br>Billy G. Mosley | v.<br>C.A. # 04-344 KAJ | Comcast Corporation, et al.<br>October 26, 2005 |

Page 26

1 why she was targeted for termination?
2  A.  There was a position that was identified as
3 areas that we could do without functionally and we
4 figured that we actually were growing as a department
5 and there were areas that we could actually do without
6 those sort of skills that Ms. Ernie and some other
7 folks had.
8  Q.  It was decided at that time that Ms. Ernie
9 should be asked to resign?
10  A.  I don't believe it was decided at that time.
11 It was a recommendation for budgetary process. There
12 were a number of people identified or positions
13 identified, but the actual discussion of Ms. Parker
14 being terminated at that time it didn't happen.
15  Q.  Were you aware whether Mr. Annone had a
16 conversation with Ms. Parker asking her to resign?
17  A.  Asking her to resign? No, I'm not.
18  Q.  To take a severance?
19  A.  Yes, I am aware of that.
20  Q.  You're aware that he asked her to take a
21 severance?
22  A.  Right.
23  Q.  And do you know what he said to her at that
24 time?

Page 27

1  A.  No. I was not present with the initial
2 meeting. So based on what Mr. Annone told me is that
3 he presented her with options and those options
4 included another position with the company, also to
5 help her search for another position within the
6 company outside of the call center and a severance
7 package.
8  Q.  Did Mr. Annone ever tell you that it would be
9 impossible to place her in another position in the
10 company because of the information that she had
11 working in HR?
12  A.  No.
13  Q.  He never told you that?
14  A.  No.
15  Q.  Were you ever aware of any such comment made
16 anywhere in the company?
17  A.  No.
18  Q.  After Ms. Ernie left, who did the work that she
19 was doing?
20  A.  The work was actually distributed through each
21 individual, benefits administrator, the recruiter, HR
22 generalist and we have since added an additional head
23 for an HR generalist.
24  Q.  How many people did you have in the HR

Page 28

1 department before Ms. Ernie left?
2  A.  I believe before she left I believe there were
3 six.
4  Q.  Six. After she left as of today?
5  A.  As of today there's nine.
6  Q.  Nine. Thanks.
7       Did you ever speak to Brian Lambert or
8 Fidel Edwards concerning Ms. Ernie?
9  A.  Did I?
10  Q.  Yes.
11  A.  No, I did not.
12  Q.  What's your understanding of why Ms. Ernie was
13 terminated? Excuse me. Severed?
14       Shall I use the word severed rather than
15 terminated?
16  A.  It doesn't matter.
17  Q.  It's the same thing. What is your
18 understanding as to why she was either terminated or
19 severed?
20  A.  Her position was eliminated.
21       MR. BATTAGLIA: Would you mark this as
22 Mosley No. 1 for identification, please?
23       (Mosley Deposition Exhibit No. 1 was
24 marked for identification.)

Page 29

1 BY MR. BATTAGLIA:
2  Q.  Mr. Mosley, we're going to hand you a document
3 of several pages. Actually, there are Comcast Bates
4 numbers 176 through 181 and ask if you you can
5 identify it for us, please, sir.
6  A.  Yes. This is an evaluation form for
7 Ms. Ernestine Parker.
8  Q.  And would you look through it and tell us who
9 did the evaluation?
10  A.  Okay. The evaluation was done by me.
11       MR. LANGEL: Maybe you didn't hear him
12 answer. He said, "The evaluation was done by me."
13       MR. BATTAGLIA: Thank you.
14  A.  Sorry.
15  Q.  That's your signature on the last page?
16  A.  Yes, it is.
17  Q.  I noticed on the signature page it says next
18 reporting supervisor, I guess. That's blank. Is that
19 correct?
20  A.  Yes.
21  Q.  Who would be the next reporting supervisor
22 there?
23  A.  Mr. Annone.
24  Q.  And he did not sign this?

8 (Pages 26 to 29)