IN THE UNITED STATES DISTRICT COURT
IN AND FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| ERNESTINE PARKER, | § § | |
| Plaintiff, | § § | |
| v. | § § | C.A. No.:        04-344 KAJ |
| COMCAST CORPORATION, a Pennsylvania corporation, COMCAST CABLE COMMUNICATIONS, INC., a Delaware corporation, COMCAST CABLEVISION OF NEW CASTLE COUNTY, LLC, a Delaware Limited Liability Corporation, successor in interest to Comcast Cablevision of New Castle County, Inc., a Delaware corporation, PHILIP ANNONE and WILLIAM G. MOSLEY, | § § § § § § § § § § § § | |
| Defendants. | § § | |

**APPENDIX TO PLAINTIFF ERNESTINE PARKER'S ANSWERING BRIEF IN
OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

BIGGS AND BATTAGLIA

/s/ Victor F. Battaglia
Victor F. Battaglia, Sr.(ID# 156)
921 Orange Street
Wilmington, DE 19801
(302) 655-9677
VictorSr@batlaw.com
Attorney for Plaintiff

DATED: December 14, 2005

## TABLE OF CONTENTS

Delaware Department of Labor Notice of Reasonable Cause ...........................B - 1

Affidavit of Ernestine Parker ........................................................................B - 3

Exhibits to Affidavit of Ernestine Parker..........................................................B - 9

Excerpts from Depositions:

      Ernestine Parker ....................................................................B - 28

      Philip Annone ........................................................................B - 65

      William Mosley .....................................................................B – 79

      Exhibits to Deposition of William Mosley .........................................B - 94



STATE OF DELAWARE
DEPARTMENT OF LABOR
DIVISION OF INDUSTRIAL AFFAIRS
4425 NORTH MARKET STREET
WILMINGTON, DELAWARE 19802

TELEPHONE (302) 761-8200
FAX (302) 761-6601

## NOTICE OF REASONABLE CAUSE

RE: Parker v. Comcast Cable, Inc.          State Case No. 0210650

On September 30, 2002 Mr. Ernestine Parker filed a charge of discrimination against Comcast Cable, Inc. The Charge of Discrimination is hereby incorporated by reference.

Reasonable Cause Finding:
    On May 30, 2003, the Department of Labor concluded its investigation and now finds, based on the following facts, that there is reasonable cause to believe that a violation of the State Discrimination Act has occurred.

I.    Undisputed Facts:
    1.  Charging Party was informed by Respondent on September 9, 2002, that her position of Human Resources Assistant was going to be eliminated as of October 31, 2002.
    2.  Charging Party had a history of a chronic condition, as evidenced by health care records on file with Respondent. On August 1, 2002, Charging Party collapsed due to "chronic headaches," the same condition she requested leave for since 2001.

II.    Disputed Facts:
    1.  Charging Party states that she was discriminated against based on a disability by being forced to resign her position or face discipline or discharge or accept a severance package.
    2.  Respondent states that in August of 2002, the decision was made to eliminate two (2) Human Resource administrative positions, and provided Charging Party as a Customer Account Representative, with no pay loss, with payment for outplacement services. Respondent denies that Charging Party ever communicated to it that she had a disability, and denies her qualified status.

I.    Resolution of Material Facts in Dispute:
Charging Party previously was on medical leave in both 2001 and 2002, for her chronic disability. While Respondent indicates that Charging Party's performance did not factor into its decision to terminate her, on August 16, 2002 a memo was prepared which detailed Charging Party's performance deficiencies. However, Charging Party was qualified to perform her position, as evidenced by her July 2002 performance evaluation, and had an impairment that significantly limited her in a major life activity. Coupled with her medical history, and the fact that Charging Party was presented with the option to be discharged or accept outplacement services within days of her collapse casts serious doubt on Respondent's stated motivation for removing Charging Party from her position.

IV.    Resolution:
Charging Party met her burden of showing that he was discriminated against based on a disability.

B-1

The Charge of Discrimination, State Case No. 0210650, will administratively be processed and assigned to a conciliation officer in an effort to administratively resolve the complaint pursuant to 19 Del. C. Section 712 ( c).

_5/30/03_
DATE

_5/30/03_
DATE

_Lonnie Allbaugh_
LONNIE ALLBAUGH, LLEO II

_Julie Cutler_
JULIE CUTLER
LABOR LAW ENFORCEMENT SUPERVISOR

B-2

IN THE UNITED STATES DISTRICT COURT
IN AND FOR THE DISTRICT OF DELAWARE

ERNESTINE PARKER, §
§
    Plaintiff, §
§
    v. §
§    C.A. No.:    04-344 KAJ
COMCAST CORPORATION, *et al.* §
§
    Defendants. §

## AFFIDAVIT OF ERNESTINE PARKER

STATE OF DELAWARE    §
§ ss.
COUNTY OF NEW CASTLE    §

**BE IT REMEMBERED**, that on this _8_ day of _December_ 2005, personally came

before me, a Notary Public in and for the state and county aforesaid, ERNESTINE PARKER, who

being by me duly sworn according to law, did depose and say that:

1. I am a Plaintiff in the captioned action brought against my former employer,

Comcast.

2. In 1998, I took a position at the New Castle County Call Center as a receptionist

for what was then Suburban Cable. Suburban Cable subsequently was purchased or taken over

by Comcast.

3. In the year 2000 I began to have chronic, daily headaches for which I sought

medical attention through my family physicians, Dr. Carl Turner then, Dr. Fallorina, as well as

neurologist, Dr. Michael Carrunchio.

B-3

4.     The headaches I began to have in the year 2000 were extremely painful, but I was able to complete all of my work duties as receptionist with good performance evaluations amd merit increases.

5.     The Human Resources Generalist at Comcast at that time, Ms. Alberina Ziemba, suggested that I submit to Comcast an application under the Family Medical Leave Act (FMLA) so that the company would have a record of my having chronic daily headaches.

6.     In January of 2001 my neurologist, Dr. Carunchio submitted a medical report confirming my chronic, daily headache problem to Comcast.   A true and correct copy of Dr. Carunchio's January 2001 FMLA Questionnaire is attached hereto as Exhibit 1.

7.     In or about June of 2001, I was offered and accepted a position at Comcast as the Human Resources ("HR") clerk which was effectively a promotion to a higher paying position. Attached hereto as Exhibit 2 is a true and correct copy of a letter from the then Recruiter in the HR Department at Comcast, Kara Pietrowicz, to me confirming my acceptance of that position.

8.     While my headaches continued through that time period, I was still able to perform all my duties satisfactorily and again received merit increases and satisfactory performance evaluations.

9.     In the late summer or fall of the year 2001, the manager of the HR Department at the New Castle Call Center, Angela Wilson, informed me and the entire HR staff that she believed she had been the victim of discrimination by Comcast because she had been passed over for the HR Director position at the New Castle County facility.   The Director position was awarded to Mr. Philip Annone.

2

10.    At the beginning of the 2002 year, early in January, I was informed by Mr. Annone that the entire HR staff, the Manager, Angela Wilson, the Benefits Coordinator, Donna Minor, the HR Generalist, Alberina Ziemba, the Recruiter, Kara Pietrowicz, and an HR clerk, Edwin Gonzalez, as well as the Vice President of the Call Center, Barbara Edwards, were being discharged from their employment at Comcast.

11.    The entire HR staff at the Call Center, except for me and one other HR employee, Sandy Ricks, were fired and would have to be replaced by new workers.

12.    Within the next few months, Mr. Billy Mosley was hired as the new HR Manager, Holly McCracken as the new Benefits Coordinator, Bethany Pace as the new Recruiter, and Michael Patterson as the new HR Generalist and that I helped to show the new employees the processes and procedures followed by the HR staff at the Call Center.

13.    After the new HR staff was hired and through the rest of the year 2002, I began to receive more assignments and responsibilities, such as typing job postings for Ms. Pace, all of which I was able to handle.  These new assignments included tasks previously performed by the other HR Clerk, Edwin Gonzalez.

14.    In late June 2001, I received a performance evaluation completed by Mr. Mosley which resulted in my receiving a merit increase.  Attached hereto as Exhibit 3 is the Personnel Action Notice ("PAN") form indicating my merit increase at that time.

15.    In mid to late July 2002, after Mr. Mosley returned from vacation, he began to call me into his office on an almost daily basis and complain about my work performance.   Many of his criticisms were inaccurate and many merely concerned minor mistakes such as typographical errors on job postings I typed.  I subsequently became aware that corrected job postings such as

3

B-5

that attached as Exhibit 4 were placed in my personnel file without my knowledge. In fact, the posting attached as Exhibit 4 was typed exactly as it was given to me by Bethany Pace.

16.    At that time in July 2002 I told Mr. Mosley about my chronic daily headaches and they problems they caused.

17.    In or about mid to late July when my workload continued to increase, and I was being criticized for my work, my headaches continued to get worse to the point where the pain was so excruciating I could not sleep, could not do any housework and I had to depend upon my husband to do almost all the cooking, cleaning and housework on an almost daily basis and the headache pain also prevented intimate relations with my husband.

18.    On August 1, 2002, in the presence of Mr. Annone, Mr. Mosley, Bethany Pace, and a number of the other employees at the New Castle Call Center, I passed out while at work due to my chronic headache condition and stressful working conditions.

19.    Mr. Mosley drove me home and during that drive we discussed my headaches and working conditions.

20.    Attached as Exhibits 5 and 6 are the reports from me and Mr. Mosley concerning that incident.

21.    After I returned to work on or about August 4, 2002, my work assignments continued to increase and Mr. Mosley continued to criticize my performance.

22.    In mid-August 2002, I submitted a second application for FMLA leave, and again, Dr. Carunchio submitted a completed questionnaire supporting my application. Attached is a true and correct copy of Dr. Carunchio's completed questionnaire as well as correspondence regarding the acceptance of my FMLA application. (Exhibit 7)

4

B-6

23.     On August 22, 2002, I met with Mr. Annone who told me that I had no future at Comcast and criticized my work performance.   I discussed with Mr. Annone my recurring headaches at another meeting with him in August 2002.

24.     In September 2002, just two months after my evaluation and merit increase, at one of my meetings with Mr. Annone where he was criticizing my work, he told me that if I did not resign and take a severance package, he would increase the pressure and continue to pile additional work to my assignments.  He then waived a thick file of papers in front of me, stating that it was my personnel file and it was filled with unfavorable criticisms of my performance and if I did not resign, Comcast would use this as evidence of my inability to perform my job put me on probation and then would fire me for cause.

25.     Mr. Annone told me that Comcast would indicate that my termination was due to a reorganization so that I could receive unemployment benefits.

26.     In early to mid September I initially told Mr. Annone I would accept the severance package and resign.  Subsequently, I decided I would not sign the severance package.

27.     After I agreed to resign the criticism and additional work which Comcast had been forcing on me let up and my headaches became somewhat more bearable.

28.     Mr. Annone told me that if I did not sign the severance agreement, Comcast would not allow me to participate in a job training program which they offered.

29.     After I told Mr. Annone I had retained an attorney, he offered me the opportunity to take another position at Comcast as a Customer Account Executive ("CAE").

5

B-7

30.     I declined the CAE position because, as I believe Mr. Annone knew, that position involved significant amounts of stress which I could not do due to my headaches and the fact that stress exacerbated my headaches, handle that position.

31.     I continued to work as the HR Clerk through early November 2002.

32.     During that time my coworkers told me that I should not continue to be so conscientious about my job when my employment was being terminated, but I continued to do my job to the best of my abilities.

33.     Even though Comcast and Mr. Annone had threatened me with being terminated for poor work performance, they ultimately told me that my job position was being eliminated due to a reorganization.

34.     The PAN form indicating my separation from Comcast is false in that it indicates I left Comcast voluntarily with a signed severance agreement.  Attached is a copy of the PAN form as Exhibit 7.

35.     After I left Comcast I obtained another position in mid-November 2002 as a sales representative at Macy's.  This was a part-time job with limited benefits and no coverage for any preexisting conditions or prescriptions.  I was able to continue receiving unemployment benefits while working part-time at Macy's.

_Ernestine Parker_

Sworn to and subscribed
before me this ___ day
of _____, 2005.

_Notarial Officer_

6

B-8

Feb. 6, 2001

EX1

# CERTIFICATION OF HEATLH CARE PROVIDER

| 1. Employee's Name | 2. Patient's Name (if different from employee). |
|---|---|
| Ernestine Parker | |

3. The following is what is meant by a "serious health condition" under the Family and Medical Leave Act. Does the patient's condition[1] qualify under any of the categories described? If so, Please check the applicable category.

    **A. Hospital Care**
    Inpatient care (i.e., an overnight stay) in the hospital, hospice, or residential medical care facility, including any period of incapacity[2] or subsequent treatment in connection with or consequent to such inpatient care.

    **B. Absence Plus Treatment**
    a. A period of incapacity[2] of more than three consecutive calendar days (including any subsequent treatment or period of incapacity[2] relating to the same condition), that also involves:

        1. Treatment[3] two or more times by a health care provider, by a nurse or physician's assistant under direct supervision of a health care provider, or by a provider of health care services (e.g., physical therapist) under orders of, or on referral by, a health care provider.

        2. Treatment by a health care provider on at least on occasion that results in a regimen of continuing treatment[4] under the supervision of the health care provider.

    **C. Pregnancy**
    Any period of incapacity due to pregnancy or for prenatal care.

    **D. Chronic Conditions Requiring Treatments** — For office visits or tests
    A Chronic Condition which:

        1. Requires periodic visits for treatment by a health care provider, or by a nurse or physician's assistant under direct supervision of a health care provider.

        2. Continues over an extended period of time (including recurring episodes of single underlying condition); and

        3. May cause episodic rather than a continuing period of incapacity[2] (e.g. asthma, diabetes, epilepsy, etc.)

---

[1]Here and elsewhere on this form, the information sought relates only to the condition for which the employee is taking FMLA leave.

[2]Incapacity, for purposes of FMLA, is defined to mean inability to work, attend school or perform other regular daily activities due to the serious health condition, treatment therefor, or recovery therefrom.

[3]Treatment includes examinations to determine if a serious health condition exists and evaluation of the condition. Treatment does not include routine physical examinations, eye examinations, or dental examinations.

[4]A regimen of continuing treatment includes, for example, a course of prescription medication (e.g., antibiotic) or therapy requiring special equipment to resolve or alleviate the health condition. A regimen of treatment does not include the taking of over-the-counter medications such as aspirin, antihistamines, or salves; or bed-rest, drinking fluids, exercise, and other similar activities that can be initiated without a visit to a health care provider.

Comcast-Parker
0228

    E. Permanent/Long-term Conditions Requiring Supervision
A period of incapacity[2] which is permanent or long-term due to a condition for which treatment may not be effective. The employee or family member must be under the continuing supervision of, but need not be receiving active treatment by, a health care provider. Examples include Alzheimer's, a severe stroke, or the terminal stages of a disease.

    F. Multiple Treatments (Non-Chronic Conditions)
Any period of absence to receive multiple treatments (including any period of recovery therefrom) by a health care provider or by a provider of health care services under orders of, or on referral by, a health care provider, either for restorative surgery after an accident or other injury, or For a condition that would likely result in a period of incapacity of more than three consecutive calendar days in the absence of medical intervention or treatment, such as cancer (chemotherapy, radiation, etc.), Severe arthritis (physical therapy), kidney disease (dialysis).

    G. None of the above

4. Describe the medical facts which support your certification, including a brief statement as to how the medical facts meet the criteria of one of these categories.

*Chronic Headache*

5. a. State the approximate date the condition commenced, and the probable duration of the condition (and also the probable duration of the patient's present incapacity[2] if different):

*> 1 year*

b. Will it be necessary for the employee to take work only intermittently or to work on a less than full schedule as a result of the condition (including for treatment describe in item F above)? _____

If yes, give the probable duration _____

c. If the condition is a chronic condition (Condition D) or pregnancy, state whether the patient is presently incapacitated[2] and the likely duration and frequency of episodes of incapacity.

6. a. If additional treatments will be required for the condition, provide an estimate of the probable number of such treatments:

Comcast-Parker
0229

B-10

2

If the patient will be absent from work or other daily activities because of treatment on an intermittent or part-time basis, also provide an estimate of the probable number of and interval between such treatments, actual or estimated dates of treatment if known, and period required for recovery if any:

_____

_____

_____

b.  If any of these treatment will be provided by another provider of health services (e.g., physical therapist), please state the nature of the treatments:

_____

_____

c.  If a regimen of continuing treatment by the patient is required under your supervision, provide a general description of such regimen (e.g. prescription drugs, physical therapy requiring special equipment):

_____

_____

7.  a.  If medical leave is required for the employee's absence from work because of the employee's own condition (including absences due to pregnancy or a chronic condition), is the employee unable to perform work of any kind?     ☐ Yes  ☒ No

   b.  If able to perform some work, is the employee unable to perform any one or more of the essential functions of the employee's job (please refer to the attached job description)? ☐ Yes  ☐ No  If yes, please list the essential functions the employee is unable to perform:

_____

_____

   c.  If neither a. or b. applies, is it necessary for the employees to be absent from work for treatment? *NA*
       ☐ Yes  ☐ No

8.  a.  If leave is required to care for a family member of the employee with a serious health condition, does the patient require assistance for basic medical or personal needs or safety, or for transportation? ☐ Yes ☐ No  *NA*

   b.  If not, would the employee's presence to provide psychological comfort be beneficial to the patient or assist in the patient's recovery? ☐ Yes ☐ No

3

c.  If the patient will need care only intermittently or on a part-time basis, please indicate the probable duration
    of this need:

_Pt. requires Periodic office visits for_
_Diagnosis & Treatment and may_
_have absence from work for Testing._

Print Health Care Provider's Name

_Mulvaux Cenualus MD_  1/26/01

Signature of Health Care Provider

_1228 N Scott St._

Address

_Wilmin De 19806_

Address

Date

_Neuro_

Type of Practice

_302 - 6562527_

Telephone Number

To be completed by employees needing Family and Medical Leave to care for a family member:

State the care you will provide and an estimate of the period during which care will be provided, including a
schedule if leave is to be taken intermittently or if it will be necessary for you to work less than a full schedule:

_____

_____

_____

_____

_____

_Ernestine Parker_

Employee's Signature

_1/26/01_

Date

4

Ex 2

 Comcast

Comcast Cable Communications, Inc.
4008 N. DuPont Highway
New Castle, DE 19720
302.661.8104 Tel
302.661.8121 Fax

June 25, 2001

Ernestine Parker

Dear Ernestine,

I am pleased to extend an offer to you for the Human Resources Clerk, effective July 2, 2001. Your skills and experience will enable you to fit nicely with our team.

Your starting salary will be $13.00 per hour. If you are in agreement with the terms contained herein, please sign and date the enclosed copy and return it to me. I look forward to your acceptance and to working with you in a very exciting and challenging environment.

Sincerely,

Kara Pietrowicz
Human Resources Representative

I accept the terms of the employment offer.

_Ernestine Parker_        _6-26-01_
Name                  Date

Comcast-Parker
0003

Ex 3

Comcast

| Action Type | ☐ New hire ☐ Re-hire ☐ Replacement ☐ New position | ☒ Salary Complete Section A-E | ☐ Leave of Absence ☐ Start ☐ Change ☐ Return Complete section A-B | ☐ Transfer Complete section A-C and D-E if applicable | ☐ Job Chg. Complete section A-C and D-E of applicable | ☐ Terminations Complete section A- | ☐ Employee Status Complete section A-D and C-E if applicable |
|---|---|---|---|---|---|---|---|

**Effective Date (*)** **07-02-2002** (*) The effective date for termination will be the day after last date worked

### Basic Employee Information A

| Last Name | First Name | M.I. | Location | Department | ALA Loc. | ALA Dept | Orig. Hire Date |
|---|---|---|---|---|---|---|---|
| Parker | Ernestine | | 867 | 500 | | | 2/9/98 |

| Current Job Title | Current Job Code | SS Number | State Lived In | State Worked In | Local Tax | Payroll Information |
|---|---|---|---|---|---|---|
| HR Assistant | N00171 | 222361421 | DE | DE | | Co Code P4B File Number 203092 |

| Current Pay Rate (**) ☒ Hourly $ 13.00 ☐ Biweekly: $ ☐ Annual: $ 27,040.00 | Reg/Temp REGULAR | Full/Part Time FULL-TIME | Scheduled Hours: 40 Per week | Shift/Diff 2nd 0.00 3rd 0.00 Bargaining Unit | FLSA Status Nonexempt | Commission Status NO |
|---|---|---|---|---|---|---|

48 x 13
32 x 13. 39

### Transfer B

| New Department | New Location | New Division | ALA Loc. | ALA Dept | State Lived In | State Worked In | Local Tax |
|---|---|---|---|---|---|---|---|
| | | | | | | | |

### Job C

| ☐ Promotion ☐ Reclassification ☐ Lateral ☐ Other – Explain | New Job Title | New Job Code | FLSA Status ☐ Exempt ☐ Non-Exempt | Bargaining Unit ☐ Union ☐ Non-Union | Commission Status |
|---|---|---|---|---|---|
| | | | | | |

### Status D

| Full/Part Time ☐ Full time ☐ Part Time | Reg/Temp ☐ Regular ☐ Temporary | Scheduled Hours Per Week | Adjusted Hire Date |
|---|---|---|---|
| | | | |

### Salary E

| Type of Salary Change Percent/Amount | Merit Rating | New Pay Rate * | Lump Sum Merit Increase |
|---|---|---|---|
| ☒ Merit 3.0 % $ .39 ☐ Promotion % $ ☐ Wage Adjustment % $ ☐ Union % $ ☐ Other % $ ***If change is over 10%, signature of the VP of Finance is required. | | ☒ Hourly $ 13.39 ☐ Biweekly $ ☒ Annual $ 27,851.20 Date of next salary change: 7/06/02 | $ _____ Shift Differential 2nd $ _____ 3rd $ _____ |

### Leave of Absence F

| ☐ Short Term Disability ☐ Unpaid Medical | ☐ Long Term Disability ☐ Unpaid Personal | ☐ Family Leave ☐ Workers Compensation | ☐ Military |
|---|---|---|---|

### Termination G

| Voluntary ☐ Other Job ☐ School ☐ Death ☐ Health ☐ Retirement ☐ Other – Explain | Involuntary ☐ Performance ☐ Policy Violation ☐ Layoff ☐ Abandonment ☐ Other – Explain | Pay Through Date / / Severance agreement? * (Include transmitted sheets) ☐ Yes ☐ No | Last Day Worked / / Vacation Pay Amount $ Hours | Benefits Through / / |
|---|---|---|---|---|

### Comments Signature

| Bill J. Mosley | 6/21/02 | M. Potter | 302.661.8215 | |
|---|---|---|---|---|
| Authorized Manager | Date | Human Resources 6/21/2002 | Phone Number | Date |

Check here if this is a corrected PAN form being sent to EPIC. ☐

| _____ | / / |
|---|---|
| Authorized Manager | Date |

B-14
Comcast-Parker
0098

*colon is unnecessary punctuation*

**POSTION:** Training Manager

**LOCATION:** Philadelphia (HQ), PA

**DIVISION:** Cable

**REPORTS:** VP, Learning and Development & VP, Ad Sales

**SUMMARY:**

- -As part of the Comcast University team, the Training Manager-Advertising Sales will play an integral part in the process of developing and delivering training products and programs to help improve performance and help meet the sales objectives of the advertising sales division.

**MAJOR DUTIES:**

- -Write, design and develop and implement various training materials and programs.
- -Get certified to teach programs from outside vendors.
- -Travel nationwide as required to conduct training programs.
- -Conduct training programs on a national basis in live classroom settings nationwide.
- -Research and evaluate potential products and vendors.
- -Conduct training programs for national, regional or other meetings.
- -Travel to various offices for fieldwork with Account Executives and to evaluate training needs — *capitalize*
- -Assist the VP of learning and Development.
- -When required – to work on weekends conducting training sessions or attending industry seminars.
- -Perform other various tasks as assigned.

**MINIMUM QUALIFICATIONS:**

**EDUCATION:**

- -Bachelor's degree or the recognized equivalent in work experience and self study.

**EXPERIENCE:** *lowercase*

- -Field Sales Experience.
- -Two years experience as a training professional or equivalent.
- -Experience conducting stand up training.
- -Experience writing/designing training programs.
- -An in depth understanding of media planning, advertising and marketing.
- -A strong work ethic.
- -Current on the latest training trends and techniques.
- -Proficiency on Word, PowerPoint and other presentation software.
- -Excellent written and verbal communication skill with the ability to communicate on all levels.
- -Ability to set and meet deadlines.
- -Strong organizational skills.
- - Previous experience with a energetic fast paced environment is a plus.

-Strong presentation skills

Call reportable claims to: 1-800-327-3636, Account # 42657, Location 854CBL

Claim #_____     Confirmation #_____

Ex5

NON-REPORT

# Ⓒomcast

## SUPERVISOR'S INVESTIGATION REPORT

☐ **AUTO ACCIDENT**     ☐ **INJURY**     ☐ **DAMAGE**

### GENERAL INFORMATION – COMPLETE FOR ALL CLAIMS

**EMPLOYEE NAME:** ERNESTINE PARKER

**HOME ADDRESS:** 1416 OLD FORGE RD     NEW CASTLE, DE 19720

**HOME PHONE:** 302-324-1682     **SS#:** 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

**DATE OF BIRTH:** 10-1-50     **SHIFT:** 8-5     **RATE:** 13.39/hr

**JOB TITLE:** HR ASSISTANT     **DATE & TIME OF INCIDENT:** 8/1/02 10:10

**DATE & TIME EMPLOYEE REPORTED INCIDENT:** 8/1/02 10:10 by WITNESS

**PLACE OF INCIDENT:** HR DEPARTMENT

**TIME SUPERVISOR ARRIVED AT SCENE:** 10:10     **DEPARTED:** 11:40

**WITNESS INFORMATION:** Bethany Pace, Holly McCracken

### AUTO ACCIDENT INFORMATION – COMPLETE FOR ONLY AUTO CLAIMS

**MUNICIPALITY OF ACCIDENT:** _____

**LANDMARKS:** _____ **CROSS STREET:** _____

**WEATHER CONDITIONS:** _____

**COMPANY VEHICLE #** _____ **LICENSE PLATE #:** _____ **YEAR:** _____

**MAKE & MODLE:** _____

**DAMAGE TO VEHICLE:** _____

Comcast-Parker
0207
B-17

ESTIMATED COST TO REPAIR VEHICLE: _____

OTHER VEHICLE LICENSE PLATE #: _____ MAKE:_____ MODLE:_____

OWNER'S NAME: _____

ADDRESS: _____

PHONE #: _____

INSURANCE COMPANY NAME: _____

VEHICLE OPERATOR'S NAME: _____

ADDRESS IF DIFFERENT THAN OWNER: _____

OPERATOR'S DRIVER LICENSE #: _____

DAMAGE TO VEHICLE: _____


**LIABILITY DAMAGE INFORMATION – COMPLETE ONLY FOR LIABILITY CLAIMS**

OWNER OF PROPERTY: _____

ADDRESS: _____

PHONE NUMBER: _____

DAMAGE TO PROPERTY & ESTIMATE DOLLAR AMOUNT OF DAMAGE: _____

Comcast-Parker
0208


**ILLNESS/INJURY INFORMATION – COMPLETE FOR ILLNESS/INJURY ONLY**

NATURE OF INJURY/ILLNESS: _Employee Blackout Fell To Floor_

WAS EMPLOYEE ABLE TO RETURN TO WORK? _Yes, but I ask her to go home for Remainder of The Day_

WAS EMPLOYEE ASSIGNED TO TRANSITIONAL DUTY?: _No_

DESCRIPTION OF HOW INJURY HAPPENED: _Employee was standing talking with Bethany Pace about work assignment when she just collapsed. She immediately got to her feet sat down and started crying. She said she has Chronic headache and has been in pain for some time, has been going to Docotor for 2yrs trying to find out what's wrong. She wanted to Continue to work I ask her to go home for the day she is g'n tomorrow for a Dr. Appt._

**ANALYSIS & CONTROL – COMPLETE FOR ALL CLAIMS**

DESCRIBE HAZARDS, UNSAFE CONDITION(S) OR ACT(S). INCLUDE FAILURE TO OR IMPROPER USE OF PERSONAL PROTECTIVE EQUIPMENT: _____

_____ *NONE* _____

_____

_____

DESCRIBE UNDERLYNING CAUSE(S) OR FAILURE(S): _____ *N/A*

_____

_____

SUPERVISOR'S RECOMMENDED CORRECTIVE ACTION TO BE TAKEN AND WHEN: _____

_____ *NONE* _____

_____

DISCIPLINARY ACTION TAKEN (Complete progressive disciplinary form if needed):

*NONE*

| None | Coaching | Verbal | Written | Suspension | Termination |
|------|----------|--------|---------|------------|-------------|
|      |          |        |         |            |             |

SUPERVISOR'S SIGNATURE: *Billy J. Mosley*

DATE: *8/1/02*    TIME: *4:05 PM*

RECEIVED BY HUMAN RESOURCES:_____ DATE: _____ TIME: _____

PREVENTABLE OR (NON-PREVENTABLE) SAFETY COMMITTEE RECOMMENDATIONS:_____

_____

SAFETY LEADERS'S SIGNATURE: _____ DATE: _____

GENERAL MANAGER'S SPECIAL ORDERS: _____

_____

GENERAL MANAGER'S SIGNATURE: _____ DATE: _____

Comcast-Parker
029919

Ex 6

# comcast.

## EMPLOYEE'S REPORT

☐ **AUTO ACCIDENT**    ☐ **INJURY**    ☐ **DAMAGE**

NAME: _Ernestine Parker_

DEPT. _____    DATE: _8/1/02_    TIME: _10:10_

Place of accident, injury or damage: _H R Department_

_____

### Describe in your own words how the accident, injury or property damage occurred. Please be as accurate and detailed as you can.

_I was standing at Bethany Pace's desk going over a work assignment when I collapsed to the floor. The only thing I remember about my fall is that I hit the back of my head on the floor. I have daily chronic head aches and a week prior to my collapse my head aches had gotten increasingly worse with each passing day. I have been under a lot of work related mental pressure and stress and coupled with my head pain, it has affected the quality of my work. I have been under Doctor's Care since January 2000. I take daily medication before bed time and my Doctor has prescripted additional medicine and blood test. My next scheduled appointment with my Neurologist is on August 30th._

Employee's Signature: _Ernestine Parker_    Date: _8-16-02_

Supervisor's Signature: _____    Date: _____

Rev 02/02

**McCracken, Holly**

Ex7

| | |
|---|---|
| From: | McCracken, Holly |
| Sent: | Friday, September 13, 2002 8:07 AM |
| To: | Parker, Ernestine |
| Cc: | Mosley, Billy; Annone, Philip; McCracken, Holly |
| Subject: | Approval for intermittent FMLA |

Importance:          High

Ms. Ernie:

Attached you will find your intermittent FMLA approval letter. Please read through its contents and **please** let me know if you have any questions. Since FMLA is an unpaid leave, if you take a FMLA day, paid time will be applied if you ha[...] remaining in the year.

Thank you.

Holly

[W]

ernestineparkerfmla
.doc

1

# Comcast.

FAMILY AND MEDICAL LEAVE ACT OF 1993
## CERTIFICATION BY HEALTH CARE PROVIDER
(THIS FORM IS BASED ON THE U.S. DEPARTMENT OF LABOR FORM WH-380)

*Ernestine Parker*

Employee's Name

~~Parent's Name (when applicable)~~

Dear Health Care Provider:

This form describes six categories that fall within the definition of a "Serious Health Condition" under the Family and Medical Leave Act. Please read the categories described below and determine if the patient's condition for which he or she is being treated qualifies under any one of the categories described. If so, please check the box, which appears next to the applicable category.

A "Serious Health Condition" under the Family and Medical Leave Act ("FMLA") means an illness, injury, impairment, or physical or mental condition that involves one of the following six categories.

**Categories 1 – 6**
*(Here and elsewhere on this form, the information sought relates only to the condition for which the employee is requested FMLA leave.)*

θ    **Category 1 – Inpatient Care**

An overnight stay in a hospital, hospice, or residential medical care facility, including any period of incapacity or subsequent treatment in connection with or consequent to such inpatient care.

R-2/1/02

1

Comcast-Parker
0193

B-22

θ     **Category 2 – Absence Plus Treatment**

(a)     A period of incapacity of more than three (3) consecutive calendar days ("incapacity" means inability to work, attend school, or perform other regular daily activities due to the Serious Health Condition, its treatment, or recovery) that <u>also</u> involves <u>either</u>:

      (1)     Treatment two or more times by a Health Care Provider, by a nurse or physician's assistant under the direct supervision of a Health Care Provider, or by a provider of health care services (e.g. physical therapist) under orders of, or on referral by, a Health Care Provider. ("Treatment" includes examinations to determine if a Serious Health Condition exists and evaluations of the condition. "Treatment" <u>does not include</u> routine physical examinations, eye examinations, or dental examinations.)

**OR**

      (2)     Treatment by a Health Care Provider on at least one occasion which results in a regimen of continuing treatment under the supervision of the Health Care Provider. (A "regimen of continuing treatment" includes, for example, a course of prescription medication, or therapy requiring special equipment to resolve or alleviate the Serious Health Condition. A "regimen of continuing treatment" <u>does not include</u> the taking of over-the-counter medications such as aspirin, antihistamines, or salves; or bed-rest, drinking fluids, exercise, and other similar activities that can be initiated without a visit to a Health Care Provider.)


θ     **Category 3 – Pregnancy**

Any period of incapacity due to pregnancy, or for prenatal care.


θ     **Category 4 – Chronic Conditions Requiring Treatments**

A chronic condition which involves <u>all</u> of the following

- Requires periodic visits for treatment by a Health Care Provider, or by a nurse or physician's assistant under direct supervision of a Health Care Provider; **and**
- Continues over an extended period of time (including recurring episodes of a single underlying condition); **and**
- May cause episodic, rather than a continuing period of incapacity (i.e., asthma, diabetes, epilepsy, etc.).

**/ 5–Permanent/Long Term Conditions Requiring Supervision**

apacity which is permanent or long term due to a condition for
it may not be effective.  The employee or family member must be
inuing supervision of, but need not be receiving active treatment
are Provider.  (Examples include Alzheimer's Disease, a severe
terminal stages of a disease.)

**jory 6 – Multiple Treatments (Non-Chronic Conditions)**

of absence to receive multiple treatments (including any period of
erefrom) by a Health Care Provider or by a provider of health care
der orders of, or on referral by, a Health Care Provider, either for
surgery after an accident or other injury, or for a condition that would
it in a period of incapacity of more than three (3) consecutive calendar
e absence of medical intervention or treatment.  (Examples are
rapy, radiation, etc. for the treatment of cancer; physical therapy for
nent of severe arthritis;  dialysis for the treatment of kidney disease.)

**F YOU HAVE SELECTED ANY ONE OF THE ABOVE SIX**
**GORIES, PLEASE PROCEED TO THE NEXT PAGE OF THIS FORM **

**IF NONE OF THE ABOVE CATEGORIES ARE APPLICABLE, CHECK**
**BOX AND PROCEED DIRECTLY TO THE SIGNATURE SECTION ON**
**LAST PAGE. **

**None of the six categories apply.**

3

Comcast-Parker
0195

R-2/1/02

B-24

**\*\* IF YOU HAVE APPROPRIATELY DESIGNATED ONE OF THE ABOVE SIX CATEGORIES,
PLEASE RESPOND TO THE FOLLOWING QUESTIONS TO DETERMINE IF THE PATIENT'S
CONDITIONS QUALIFIES\*\***

1.  Is the patient incapacitated?    θ Yes    (θ No.)
    ("Incapacity" under the FMLA means the inability to work, attend school, or perform other
    regular daily activities due to the Serious Health Condition, its treatment, or recovery.)

2.  Describe the medical facts which support your certification, including a brief statement as to
    how the medical facts meet the criteria of the category of Serious Health Condition selected:

    _approx 7 yr. Hx. "Chronic Headaches._

3.  a) Approximate date the condition commenced:          — _See above_
       Probable duration of the condition:                 — _indefinite_
       Probable duration of the patient's **present incapacity:**

    b) Will it be necessary for the employee to work only intermittently or to work on a less than
       full schedule as a result of the condition or treatment?    θ Yes    (θ No)

       If Yes:  State the probable duration of the treatment:
                State the estimated interval between such treatments:   _Variable office visits_
                State the actual or estimated dates of treatment:       _~ q 4-6 wney._
                State the estimated period required for recovery, if any:

    c) Is the condition a chronic condition? (see definition under Category #4)   (θ Yes)   θ No

       Is the condition pregnancy?    θ Yes    (θ No)

       If either a chronic condition, or a pregnancy, is the patient presently incapacitated?
       θ Yes    (θ No.)

       What is the likely duration and frequency of any episodes of incapacity?

       _Can not predict_

4.  a) Will additional treatments provided by, or supervised by a Health Care Provider be
       required for this condition?   (θ Yes)   θ No.

       If so, provide an estimate of the number of such required treatments:

       _Can not predict_

    b) If any of these treatments will be provided by another Healthcare Provider (e.g., physical
       therapist, etc.), please state the nature of the treatments:

Comcast-Parker
0196
B-25

c) If a regimen of continuing treatment by the patient is required under your supervision, provide a general description of such regimen (e.g., prescription drugs, physical therapy requiring special equipment, etc.):

_medication / possibly PT_

5. a) If a medical leave is required for the employee's absence from work because of the employee's own condition (including absences due to pregnancy or a chronic condition), *is the employee unable to perform work of any kind?* (θ Yes)  θ No  — _Determine flare up period._

If the employee is able to perform some work, is the employee *unable* to perform any one or more of the essential functions of the employee's job? θ Yes  θ No  (the employee or the employer should provide you information about the essential job functions).

If your answer was "yes," please list the essential function(s) the employee is unable to perform:

b) If the absence is NOT for the employee's own condition, or if the employee is able to perform the essential functions of the job, is it necessary for the employee to be absent from work for treatment?  θ Yes     θ No

6. a) If the leave is required to care for the employee's family member who has a Serious Health Condition, does the patient (family member) require assistance for basic medical or personal needs, or safety, or for transportation?  θ Yes     θ No

b) If "no," would the employee's presence to provide psychological comfort be beneficial to the patient or assist in the patient's recovery?  θ Yes     θ No

c) If the patient will need care only intermittently or on a part-time basis, please indicate the probable duration of this need: _____

_Mulvey Carvelho_  JMD          NEUROLOGY
(Signature of Health Care Provider)              (Type of Practice)

Date Signed: _6/15/05_                                          (302)
                                       Phone Number: _656-2527_

_1228 N. Scott St_
(Address)

_Wilm De_
(Address)            _19806_

12 x8

**Comcast**

| Transaction Type | | | | | | | |
|---|---|---|---|---|---|---|---|
| ☐ New hire<br>☐ Re-hire<br>☐ Replacement<br>☐ New position | ☐ Salary change<br>*<br>Complete Section<br>A-E | ☐ Leave of<br>Absence<br>☐ Start<br>☐ Change<br>☐ Return | ☐ Transfer<br><br>Complete<br>section A-B | ☐ Job Change<br><br>Complete section<br>A-C and D-E of<br>applicable | ☒ Terminations<br>Complete section<br>A-G | ☐ Employee Status<br><br>Complete section A-D and<br>C-E if applicable |

Effective Date (*) 11 , 5 , 2002

(*) All pay rate changes should be effective at the start of each pay period (Monday)
(**) The effective date for termination will be the day after last date worked.

| Last Name | First Name | M.I. | Social Security Number | Union | Original Hire Date |
|---|---|---|---|---|---|
| PARKER | Ernestine | | 222361421 | N/A | 02/09/1998 |

| Current Job Title | Current Job Code | Dept. ID | Dept. ID Description | Reporting Location (Split Wrap) | Work Location (Taxes) |
|---|---|---|---|---|---|
| HR Assistant | N00171 | 0008675500 | NCCC | DEN02 | DEN02 |

**Current Pay Rate (*)**
☒ Hourly $ 13.39
☐ Biweekly: $
☒ Annual: $ 27,851.20

**Regular/Temporary**
☒ Regular
☐ Temporary
Scheduled Hours: 40
Per week

**FLSA Status**
☐ Exempt
☒ Non-Exempt

**Car Allowance Status**
☐ Yes
Mthly Amount $

**Pay Group** PET

Employee ID 100283092
Leave blank for new hires.

Salary ALA Dept ID

| New Department ID | New Reporting Location (Split Wrap) | New Work Location (Taxes) | Pay Group | Employee ID | Salary ALA Dept ID |
|---|---|---|---|---|---|
| | | | | | |

| ☐ Promotion ☐ Reclassification<br>☐ Lateral ☐ Other – Explain | New Job Title | New Job Code | FLSA Status<br>☐ Exempt<br>☐ Non-Exempt | Union | Direct Supv/Mgr (Last,First Name) |
|---|---|---|---|---|---|
| | | | | | |

| Regular/Temporary<br>☐ Regular ☐ Temporary | Scheduled Hours Per Week | Adjusted Hire Date | | |
|---|---|---|---|---|
| | | | | |

**Type of Salary Change   Percent/Amount**
☐ Merit _____ % $ _____
☐ Promotion _____ % $ _____
☐ Wage Adjustment _____ % $ _____
☐ Union _____ % $ _____
☐ Other _____ % $ _____

***If change is 10% or more, signature of the VP of Finance is required.

**New Pay Rate ***
☐ Hourly $ _____
☐ Bi-weekly $ _____
☐ Annual $ _____
Date of next salary change:
_____ / _____ /

**Performance Bonus Potential**
_____ %
NCTI Bonus *
$ _____
*This information will always be keyed at the location level.

| ☐ Short Term Disability | ☐ Long Term Disability | ☐ FMLA | ☐ Military |
|---|---|---|---|
| ☐ Unpaid Medical | ☐ Unpaid Personal | ☐ Workers Compensation | ☐ Other |

**Voluntary**
☐ Other Job
☐ School
☐ Death
☐ Health
☐ Retirement
☒ Other – Explain

**Involuntary**
☐ Performance
☐ Policy Violation
☐ Layoff
☐ Abandonment
☐ Other – Explain

**Pay Through Date** 12,2,02
**Last Day Worked** 11,4,02
**Benefits Through** 12,31,02

Severance agreement? *
(Include transmitted sheets)
☒ Yes ☐ No

**Vacation Pay**
Amount $ 535.60
Hours 40

Separation Agreement w/ Severence

_____ / _____ /

Authorized Manager _____ Date _____

_____ 11/4/02
Authorized Manager          Date

M Paull _____ 6618215  10.25.02
Human Resources          Phone Number          Date

1 % P A N          B-27

ERNESTINE PARKER                                                    23

1        A      No.

2        Q      You're not aware of that?

3        A      No.

4        Q      But, yet, you were a human resource clerk?

5        A      Yes.

6        Q      And worked in the human resource department?

7        A      Yes.

8        Q      There comes a point in time where you believe that

9    you were discriminated against on the basis of your belief

10   that you had a disability, correct?

11       A      Yes.

12       Q      When that time comes about, did you inquire as to

13   whether Comcast had a non-discrimination policy?

14       A      I did not.

15       Q      Why not?

16       A      I don't know.

17       Q      Now, in this case, you allege you had a disability?

18       A      Yes.

19       Q      What is your disability?

20       A      Chronic daily headaches.

21       Q      When did you begin to have chronic daily headaches?

22       A      In 2000.

23       Q      What causes your headaches?  Do you know?

24       A      I don't know.

ERNESTINE PARKER                                    24

1     Q    And you say chronic daily.  Tell us exactly how

2   often you get these?

3     A    Every day.

4     Q    I asked you earlier if you ever had any difficulty

5   performing any of your job duties.  And I believe you said,

6   no?

7     A    That's right.

8     Q    So, then, your headaches never prevented you from

9   doing your job?

10    A    They did not.

11    Q    And even though you had to do a lot of reading on

12  the computer, your headaches never prevented you from doing

13  the reading on the computer, correct?

14    A    That's right.

15    Q    Let's go back for a second.

16         Did your supervisors change at any time while

17  at Comcast?

18    A    When I worked at the front desk --

19    Q    Take it just as human resource clerk.  I'm sorry.

20    A    No, it did not.

21    Q    So when you left your employment with Comcast, who

22  was your supervisor?

23    A    Phil Mosley.

24    Q    When did that happen?  When did he become your

1    Q    You have just told us you were not having any

2    difficulty doing your job.  Did you tell him you were not

3    having any difficulty doing your job during that

4    conversation?

5    A    I didn't have any difficulty doing my job, what I

6    was doing at that time.

7    Q    Did you make any requests of Mr. Mosley?

8    A    I did not.

9    Q    Did you ever have any subsequent conversations with

10   Mr. Mosley about your headaches?

11   A    What do you mean by that?

12   Q    Well, you told us that at that meeting when you were

13   getting your evaluation in what you believe is July 2002,

14   you told him you were having headaches, correct?

15   A    Yes.

16   Q    After July 2002, did you ever discuss your headaches

17   with him again?

18   A    Yes, I did.

19   Q    And when was that?

20   A    It was in August.  I believe it was August 5th, that

21   I collapsed at work.  Mr. Mosley took me home.  On the ride

22   home, we talked about my headaches.

23   Q    And what was the conversation?

24   A    Mr. Mosley told me that his wife had headaches

ERNESTINE PARKER                                    27

1    before she was diagnosed and it took a long time.  I think a

2    couple years before they found out what was wrong with her.

3    And he encouraged me to get help.

4        Q    Let's go to the July conversation.  You said you

5    were getting your evaluation.  Did you tell him why you were

6    getting your evaluation or discussing your evaluation?

7        A    It was not during the evaluation.  We were

8    discussing my work on a daily basis.  And I told him that I

9    had daily chronic headaches.

10       Q    Tell me what you mean by you were discussing your

11   work on a daily basis?

12       A    Every day Mr. Mosley would have me come into his

13   office and we would discuss my work.

14       Q    You mentioned an evaluation.  Did you get an

15   evaluation in or around July of '02?

16       A    I believe it was in June I did get an evaluation.

17       Q    Were you displeased with that evaluation?

18       A    No.

19       Q    So tell us what prompted you to have a discussion

20   with Mr. Mosley in July of '02 where you mentioned your

21   chronic headaches?

22       A    I don't remember.

23       Q    During your daily conversations with Mr. Mosley, did

24   he ever criticize your work?

**W&F**

**WILCOX & FETZER LTD.**
Registered Professional Reporters

B-31

ERNESTINE PARKER                                                    28

1    A    Yes.

2    Q    And when was the first time he ever criticized your

3    work?

4    A    That's a long time.  I don't remember.  This was

5    back in '02.

6    Q    Before July of '02?

7    A    Before July of '02, I never received any complaints

8    about my job performance.

9    Q    And do you recall when you first received a

10   complaint about your job performance?

11   A    It was in July.  July 22nd.  Mr. Mosley had came

12   back to work from vacation.  That's when it started.

13   Q    And what was his complaint?

14   A    I don't remember.

15   Q    You don't remember.

16        Do you recall his discussing with you that you

17   needed to handle an increased volume of work and weren't

18   doing that satisfactorily?

19   A    Yes.

20   Q    Do you recall him discussing with us basic typing

21   errors when completing weekly schedules?

22   A    No.

23   Q    Do you recall his discussing with you that you were

24   completing projects late?

1    A    Yes.

2    Q    Did you faint?

3    A    I just passed out.

4    Q    And did Mr. Mosley come to your assistance?

5    A    Yes.

6    Q    And I take it from what you said he drove you home?

7    A    Yes.

8    Q    And during the ride, you discussed his wife having

9    headaches and problems?

10    A    Um-hmm.  Yes.

11    Q    Was Mr. Mosley sympathetic?

12    A    Yes, he was.  Very.

13    Q    Was he concerned for your health?

14    A    Yes.

15    Q    And when you returned to work in August of '02, did

16    he continue to be sympathetic?

17    A    No.

18    Q    He changed after that?

19    A    He had changed prior to August.  It was -- right

20    after he came back from vacation when all the complaints,

21    the nit-picking, interrogation and all that started.

22    Q    Um-hmm.  And what's all that?  Tell us about that.

23    A    Just complaints.  Mostly on the job assignments that

24    I was doing for Bethany Pace.

ERNESTINE PARKER                                    31

1      Q      Did he share with you that Bethany Pace had

2   expressed some concerns?

3      A      Yes.

4      Q      About the quality of your work?

5      A      Yes.

6      Q      And that was all before you ever discussed with him

7   that you had chronic headaches?

8      A      I discussed with him my headaches.  It was in July.

9      Q      But it was after he started to bring to your

10  attention the concerns that he had about the quality of your

11  work?

12     A      I believe so.

13     Q      Up until that time, describe your relationship with

14  Mr. Mosley?

15     A      It was a good relationship.

16     Q      Were you insulted by his criticism of your work?

17     A      Not insulted, no.

18     Q      Did you take him personally?

19     A      No.

20     Q      Did they upset you?

21     A      It did upset me.

22     Q      You say that your relationship changed.  How did it

23  change?

24     A      It changed because every day I was being called into

ERNESTINE PARKER                                              32

1    his office about something I had did wrong.  Prior to that,

2    there were no complaints.

3        Q    But, yet, in August, the day you collapsed, he came

4    to your aid and he drove you home and he was very

5    sympathetic?

6        A    That's right.

7        Q    And did he give you advice of what you needed to do

8    for treatment of your headaches?

9        A    No.

10       Q    But he did tell you about his wife's headaches and

11   what she was able to do for her's?

12       A    Yes.

13       Q    Other than your chronic headaches, are there any

14   other disabilities?

15       A    No.

16       Q    Other than your conversation with Mr. Mosley that

17   you were having headaches, did you give Comcast any other

18   documentation regarding your headaches?

19       A    Documentation?

20       Q    Yes.

21       A    No.  When I applied for family medical leave, my

22   doctor had to fill out a form.  That was documentation.

23       Q    And do you remember when that --

24       A    I had applied for it when Donna Minor was still

1    benefits coordinator and I applied again when Holly

2    McCracken was the benefits coordinator.

3       Q    Do you have any reason to believe that Mr. Mosley

4    knew about those applications?

5       A    I don't know.

6       Q    Any reason to believe that Mr. Mosley ever saw your

7    doctor's notes in connection with those applications?

8       A    I don't know what the policy is or the procedure.

9       Q    I take it that you're not seeing a doctor today

10   regarding your chronic headaches?

11      A    I don't go to a doctor today because I can't afford

12   it.

13      Q    So I take it you're not seeing a doctor today about

14   your chronic headaches?

15      A    I am not.

16      Q    And I take it from what you have told us that while

17   at Comcast you were not given any work restrictions by your

18   doctor of things you could do and couldn't do at work?

19      A    My doctor -- Dr. Turner, when I first started having

20   headaches, he wanted me to go out on medical leave because

21   of the medication he prescribed would make me really drowsy

22   and he didn't want me to drive to work. He wanted me just

23   to be out from work while I was on the medication.

24      Q    And did you leave work?



1     A    I did not.

2     Q    You did not?

3     A    No.

4     Q    So then I'll ask the question again.

5          You continued to work.  Were you able to do

6   your job?

7     A    Yes, I was.

8     Q    So you weren't given any work restrictions?

9     A    No.

10    Q    He recommended that you not work but you were not

11  given any work restrictions?

12    A    No.

13    Q    And when was that when he recommended that you not

14  work?

15    A    This was when I first started having headaches in

16  2000.

17    Q    Now, let's fast forward to this 2002 period at the

18  time you told Mr. Mosley that you were having headaches.

19  Did you have any work restrictions then?

20    A    No.

21    Q    So you could do your job completely?

22    A    Yes.

23    Q    Focusing again on July of 2002 when you tell

24  Mr. Mosley about your headaches.  Did your headaches keep

1    you from doing any day-to-day activities?

2        A    A lot of times I couldn't exercise.  I used to like

3    to go to the fitness center at Comcast.  And I wasn't able

4    to exercise during that time.

5        Q    Anything else?

6        A    No.  You mean work-related?

7        Q    Yes.  Start with work-related.

8             Anything else?

9        A    No.

10       Q    All right.  Did your headaches impact your ability

11   to perform any other activities?

12       A    Personal activities?

13       Q    Sure.  Any day-to-day activities.

14       A    Yes.  I wasn't able to read, couldn't watch

15   television.  I wasn't able to sleep.  It was just a very

16   depressing, hurtful time in my life.

17       Q    All right.  Let's focus first on you weren't able to

18   read.  I asked you a while ago if you spent time on the

19   computer in your job as a human resource tech.  Do you

20   recall that?

21       A    Yes.

22       Q    And I asked you whether you spent up to three to six

23   hours a day on the computer reading.  And you recall telling

24   me yes?

ERNESTINE PARKER

48

1        A    My manager, Jim.  He was the manager for facilities.

2    I can't remember his last name.

3        Q    So Mr. Mosley.  But you have told us already that

4    Mr. Mosley by July of 2002 was criticizing your work?

5        A    That's right.

6        Q    What was the reason you were given for your

7    termination?

8        A    Reorganization.

9        Q    It wasn't that your work was poor?

10        A    I was given the excuse that it was reorganization.

11        Q    That was the explanation.  You called it an excuse.

12    That was the explanation, correct?

13        A    Yes.

14        Q    You also in that interrogatory response to paragraph

15    seven or number seven claimed that defendants admit

16    defendant Annone offered the plaintiff the opportunity for

17    job training after her termination but withdrew the offer

18    after she refused to sign their severance package, correct?

19        A    That's right.

20        Q    What exactly did Mr. Annone tell you?

21        A    After I left Comcast, after I was terminated, he

22    called me at home to inform me that there was a job seminar

23    down at C&E, they were having it at the C&E building, and he

24    was offering me to come and be a part of that.  And I said,

1    oh, that's fine, sounds really nice.

2              Then he called me back the next day and said,

3    oh, you know, you never signed that severance package.  So

4    unless you sign that, you won't be able to participate.

5        Q     Before you left Comcast, were you, in fact, offered

6    another position?

7        A     No, not that I can remember.

8        Q     You can't remember ever being offered a position as

9    a CAE or a customer account executive?

10       A     Oh, yes, that.

11       Q     You can recall being offered that?

12       A     Yes, I do.

13       Q     Sometimes that's referred to as a customer account

14   representative?

15       A     Um-hmm.

16       Q     And that was before you left the employ of Comcast,

17   correct?

18       A     That's right.

19       Q     And do you recall when you were being offered that

20   position that you were being offered that position with all

21   your benefits?

22       A     That was never discussed.

23       Q     Did anyone tell you your benefits would be taken

24   away from you in that position?

1    headaches?

2        A    Yes.

3        Q    And you told us who was aware of your headaches

4    before Mr. Mosley started criticizing your work in July of

5    2002?

6        A    Yes.

7        Q    You say in response to interrogatory number eight,

8    defendants, through Annone, threatened plaintiff that if she

9    did not quit, they would pile work on her, make a file on

10   her showing unsatisfactory performance whether or not that

11   was true and use that as an excuse to terminate her

12   employment.

13            What is it that you claim Mr. Annone said to

14   threaten you?

15       A    Exactly what you read.

16       Q    What were his words?

17       A    I can't remember his exact words.

18       Q    When do you claim this happened?

19       A    I don't remember the exact date either.

20       Q    I take it it was after July of '02?

21       A    It was.

22       Q    And before you left employment?

23       A    That's right.

24       Q    Where were you?  Where were you when he said it to

ERNESTINE PARKER                                         55

1    you?

2        A    In his office.

3        Q    Just the two of you?

4        A    Yes.

5        Q    Did you go to his office?

6        A    He called me in there.

7        Q    And tell us the entire conversation that took place?

8        A    I can't remember the entire conversation.  That was

9    over three years ago.

10       Q    But you can remember this?

11       A    Yes, I do.

12       Q    When in the course -- go ahead.

13       A    I don't remember word for word.

14       Q    When in the course of the conversation did this come

15   up?

16       A    I don't know.

17       Q    Now, he says that you say that he said to you if you

18   did not quit, they would pile work on you and make a file on

19   her showing unsatisfactory work performances?

20       A    He said that and he actually held up the file and

21   showed it to me.

22       Q    Yet, they offered you a job as a customer account

23   executive?

24       A    And that's because they knew that I had seeked legal

1   action.

2      Q    We'll get to that in a moment.  All right?

3            But regardless, they offered you a position as

4   a customer account executive?

5      A    They offered me the job that I wasn't qualified for.

6      Q    Did they offer you training for that job?

7      A    There is training.

8      Q    Did they offer you training for that job?

9      A    Training comes automatically with the job.

10     Q    So you knew you had the opportunity to have training

11  for that job?

12     A    That's right.

13     Q    And you can't tell us when it happened that Mr.

14  Annone threatened you?

15     A    No.

16     Q    What month?

17     A    I would say it was September.

18     Q    All right.  What week in September?

19     A    Rather than guess and give the wrong answer, I'm

20  going to say I don't remember.

21     Q    Why do you believe Mr. Annone would threaten you

22  like that?

23     A    That's a good question.  I don't know.  I do not

24  know.

1    Q    This just came out of the blue?

2    A    I guess.  Because I would -- I would say because

3    they wanted me to quit, wanted me to resign.

4    Q    When do you claim that Mr. Annone learned of your

5    headaches?

6    A    I don't remember.

7    Q    Well, do you know if he ever learned of it before

8    you left?

9    A    I don't.  I would think that Holly would have shared

10   it with him when I gave her the paperwork back for family

11   medical leave.

12   Q    Why do you think that Holly would have shared that

13   with him?

14   A    Because he was a director.

15   Q    Why would you think he would need to know what your

16   illness was?

17   A    Because of what I was going through.

18   Q    Why would you think that Holly actually shared it

19   with him?  Do you have any personal knowledge that she

20   actually --

21   A    No, I do not.

22   Q    Did Mr. Annone ever say anything to you about your

23   headaches?

24   A    I don't remember.  I do remember one time he was

1    addressing me and I told Phil that I felt like I was hanging

2    on by a thread.  That's just how shattered my nerves were

3    and how bad the headaches were.  He had no comment.

4        Q    You didn't mention the headaches to him, though?

5        A    Yes, I did.

6        Q    You said you were hanging on by your nerves as a

7    result of headaches?

8        A    The headaches and the work.

9        Q    The headaches and the work.

10            When was that?

11       A    That was on August 22nd.

12       Q    That was on August 22nd?

13       A    That's right.

14       Q    You recall that?

15       A    Um-hmm.

16       Q    And by this time, August 22nd, your work was being

17   heavily criticized?

18       A    That's right.

19       Q    So the earliest you know that Mr. Annone had any

20   idea of your headaches was August 22nd, '02?

21       A    He may have known before then.  I don't know.

22       Q    Now, the earliest that you know -- please listen to

23   the question.  We are not talking about mays.  That you know

24   that he knew about your headaches was August 22nd?

1     A      Um-hmm.

2     Q      And by this time, your work was being heavily

3    criticized?

4     A      That's right.

5     Q      And did Mr. Annone say anything to you in response

6    to your mention to him that you were having headaches?

7     A      I don't recall that he did.

8     Q      Take a look at interrogatory nine.

9     A      Okay.

10     Q      You were asked to describe all facts in support of

11    your claim for wrongful termination.  And do you see what

12    your response was?  You refer to your answer above and you

13    also say, defendant fabricated reasons for firing plaintiff

14    including false claims she was not performing her job

15    satisfactorily.

16            Do you see that?

17     A      Yes, I do.

18     Q      You told us a little while ago that you were told

19    that the reasons for your termination was job elimination?

20     A      Um-hmm.  Yes.

21     Q      Comcast never told you that you were being fired for

22    poor work performance, did they?

23     A      Mr. Annone made it a big issue about my work

24    performance.

1    Q    Did anyone else hold the position that you held?

2    A    I don't remember.  Before I came to human resources,

3    I don't remember.

4    Q    At the time that you were told that your job was

5    being eliminated, were you aware that any other jobs were

6    being eliminated?

7    A    I didn't find out about Sandy Ricks' job being

8    eliminated until later on.

9    Q    But you did learn that Sandy Ricks' job was also

10    being eliminated?

11    A    That's right.

12    Q    What do you contend were the fabricated reasons?

13    A    You mean the reason why I was terminated?

14    Q    You say the defendant fabricated reasons.  What were

15    the fabricated reasons?  What were they saying?

16    A    That I was performing poorly.

17    Q    And, specifically, what were they saying that you

18    were doing poorly?

19    A    I don't know word for word.  It's been a few years.

20    Q    And your answer says, fabricated reasons for firing

21    plaintiff including false claims she was not performing her

22    job satisfactorily.

23         Anything else that they fabricated?

24    A    Not to my knowledge.

1    Q    And you say you can't remember specifically.  Can

2    you remember anything that they were telling you about poor

3    performance?

4    A    No.

5    Q    Who do you believe fabricated the reasons for

6    terminating?

7    A    I don't know.

8    Q    Do you believe Mr. Mosley fabricated the reasons

9    when he was being critical of your work?

10    A    I don't know.

11    Q    And when he was being critical of your work, he was

12    actually sharing with you specific criticisms, correct?

13    A    That's right.

14    Q    Did he discuss his criticisms with you?

15    A    Yes, he did.

16    Q    Did anyone else criticize your work?

17    A    No.

18    Q    But you believe that some criticisms came from

19    Ms. Pace?

20    A    That's right.

21    Q    And do you know what her criticisms were?

22    A    No.

23    Q    Do you believe that she was lying about her

24    criticisms?

ERNESTINE PARKER                                    62

1    A    I don't know.

2    Q    Do you know who made the decision to terminate your

3    employment?

4    A    No, I don't.

5    Q    Did anyone ever tell you your employment was being

6    terminated because of job performance?

7    A    I don't remember.  I can't remember.

8    Q    Who informed you that your employment was being

9    terminated?

10   A    Mr. Annone.

11   Q    Was it Mr. Annone who also offered you a position as

12   a CAE?

13   A    I think so.

14   Q    What exactly did Mr. Annone say to you when he told

15   you your position was being eliminated?

16   A    I don't know exactly what was said.  But when the

17   severance package was written up, it stated that it was due

18   to reorganization.

19   Q    You say you don't know exactly what he said to you.

20   Do you recall anything of what he said?

21   A    No.

22   Q    As far as you understood at the time, it was the

23   company's position that it was as a result of

24   reorganization?

ERNESTINE PARKER                                    63

1      A     I thought it was due to my poor work performance,

2  all the mistakes that they had the big folder on.

3      Q     That's what you thought?

4      A     Yes.

5      Q     Did anyone tell you that was the reason?

6      A     No.

7      Q     And Mr. Annone, when he met with you, actually told

8  you that it was because of job elimination, correct?

9      A     After the fact.

10     Q     And the paperwork also told you it was job

11 elimination, correct?

12     A     That's right.

13     Q     And you later found out that Sandy Ricks' position

14 was also eliminated, correct?

15     A     That's right.

16     Q     And you can't tell us what Mr. Annone said to you?

17     A     I can't remember.  I'd rather not guess.

18     Q     But you do acknowledge that no one, including

19 Mr. Mosley and Mr. Annone, ever told you it was because of

20 job performance?

21     A     I can't remember.

22     Q     But you do acknowledge also that they were giving

23 you the opportunity to continue to work?

24     A     After the fact.

ERNESTINE PARKER

64

1    Q    What do you mean after the fact?

2    A    After I had informed them that I had an attorney.

3    Q    But you were still employed there, correct?

4    A    Yes.

5    Q    And they offered you the position of CAE?

6    A    Yes, sir.

7    Q    When did you retain counsel?

8    A    I believe it was in September.  In September of '02.

9    Q    Do you remember when in September of '02?

10   A    No.

11   Q    Who do you claim that you told that you retained

12   counsel?

13   A    Mr. Annone.

14   Q    And when did you tell Mr. Annone that you retained

15   counsel?

16   A    I don't know the exact date.

17   Q    Do you know where you were when you told him?

18   A    In his office.

19   Q    And what occasioned you to be in his office?

20   A    I don't know.

21   Q    Did you go in there just to tell him that you had

22   hired a lawyer?

23   A    No.

24   Q    What prompted you to tell him you had hired a

1    believed you were being discriminated against because of

2    chronic headaches?

3        A    No.

4        Q    But you knew that there was an avenue for internal

5    complaints within Comcast?

6        A    Yes.  I felt at the time that Mr. Mosley was my

7    enemy.

8        Q    Well, was Mr. Patterson your enemy?

9        A    I don't know.  I don't think he was.

10       Q    Did you ever complain to Mr. Patterson?

11       A    No.

12       Q    You knew employees got access to Mr. Patterson when

13   they had concerns about what was going on at work, correct?

14       A    Yes.

15       Q    But you never took the occasion to complain to

16   anyone at Comcast, be it Mr. Mosley or anybody else?

17       A    No.

18       Q    Why not?

19       A    No specific reason.  I just didn't.

20       Q    So you had a handbook, correct?

21       A    That's right.

22       Q    And you knew employees could make complaints?

23       A    Yes.

24       Q    But you never raised a complaint?

1      A      I did not.

2      Q      You never gave Comcast an opportunity to remedy what

3   you believed was discrimination, did you?

4      A      I did not.

5      Q      Why not?

6      A      Because I felt that my job was in jeopardy and I

7   just tried to work hard and do the best I could to keep my

8   job.

9      Q      And what made you think your job was in jeopardy?

10     A      Because of the folder that they had all my mistakes

11  in.

12     Q      Now, the folder that they had, these are criticisms

13  that Mr. Mosley would bring to your attention, correct?

14     A      I'm assuming that's what was in there.  I never saw

15  my folder.

16     Q      How do you know that they had a folder?

17     A      Phil showed it to me.  One day I was in his office

18  and he held it up and he showed me this folder with all the

19  complaints in there.

20     Q      And you're assuming that these were complaints that

21  Mr. Mosley discussed with you?

22     A      Yes.

23     Q      And you're assuming they were complaints that

24  Ms. Pace had about you?