1    you had started before July 19th?

2        A    That's right.

3        Q    And prepare new hire packets.  Is that additional

4    responsibility, too?

5        A    Yes.

6        Q    And prepare new hire personal folders?

7        A    Yes.

8        Q    Are those all in connection with Bethany Pace?

9        A    Yes.

10       Q    And post HR tracking data?

11       A    Yes.

12       Q    Is that Bethany Pace as well?

13       A    Yes.  All these are Bethany Pace.

14       Q    Any other new responsibilities?

15       A    No.  The PAN forms were assigned to me before

16   Bethany Pace's additional responsibilities.

17       Q    So even before the July 19th date, you had the PAN

18   form responsibilities?

19       A    Yes.

20       Q    And tell us again, when would you do this additional

21   work?  Would you take it home at night?

22       A    The work that I could take home, I would take home.

23   Like the PAN forms.  If we were starting a new hire class,

24   say like Monday, I might take things home on Friday so that

```
 1     everything would be together, the folders would be together

 2     and ready to give out.

 3         Q     And when you got home, when did you leave work?

 4         A     At 5:00 o'clock.

 5         Q     And when would you get home?

 6         A     Maybe 6:00. It depended on the traffic.

 7         Q     And when would you start doing the work?

 8         A     After dinner.

 9         Q     And what time would dinner be?

10         A     I would probably start them about 7:00, 7:30.

11         Q     What time did your husband come home from work?

12         A     I believe it was 4:30.  He got off at 4:00 o'clock.

13         Q     And would he cook dinner every night?

14         A     Yes.

15         Q     You never cooked?

16         A     Not during the week, I didn't.  On the weekends, I

17     did.

18         Q     So on the weekends, you continued to cook?

19         A     Yes.

20         Q     When did you stop cooking during the week?

21         A     I would say it was probably around the time my

22     headaches started getting worse.

23         Q     And when was that?

24         A     This was in around July.
```

ERNESTINE PARKER                                    136

1    eliminate me, that it caused me to have greater headaches.

2        Q    So you're not claiming, then, that Comcast fired you

3    because you had chronic headaches?

4        A    I don't know.  I really don't know why.  I really

5    don't know why they fired me.

6        Q    At least you allege in the complaint that they were

7    firing you because you had chronic headache.

8             My question is, if they were firing you because

9    you had chronic headaches, why would Mr. Annone be

10   encouraging you to post for another position?

11       A    You'll have to ask him that.

12       Q    And why would he be offering you another position as

13   a CAE?

14       A    He offered me a position after I told him that I had

15   an attorney.

16       Q    I understand that.  But if they were firing you

17   because of your chronic headaches, why would he be

18   encouraging you to post for a position?

19       A    I'm assuming that he knew that I would not take the

20   job like that because it would be much -- too much stress.

21       Q    Yeah, but to post for a position wasn't even limited

22   to a CAE position?

23       A    That's the only one that he said I could apply for.

24       Q    Yeah, but when you went to him, you just wanted to

1    office knew that I was sick.  The whole office.  But they

2    continued with the harassment.  They continued with the

3    overload of work.  It didn't stop.  It just continued.  And

4    I just came to a point where I said I can't do this anymore,

5    I can't stay here anymore.

6        Q     You say you can't do this anymore, you can't stay

7    here anymore.  You were doing your work, correct?

8        A     I was doing the best I could.

9        Q     You thought you were doing a good job?

10       A     I was doing the best I could with all the work that

11   I had.

12       Q     And you were doing that work during the day and at

13   home at night?

14       A     Some of it at night, yes.

15       Q     Did you ever ask Mr. Mosley to let up on the amount

16   of work he was giving you?

17       A     To let up?

18       Q     Yeah.

19       A     No.

20       Q     Did you ever tell Mr. Mosley or Mr. Annone or

21   Ms. Pace or anyone else that the amount of work they were

22   giving you was increasing your headaches?

23       A     I didn't.  I was afraid.  I just tried to do all the

24   work because I didn't want to lose my job.  I didn't want to

1    complain about my workload.  I was just trying to do it all.

2        Q    Before you told me, I asked you when Mr. Annone told

3    you that if you did not resign and take a severance, he

4    would increase the pressure in additional work being

5    assigned to you.  Do you remember that?

6        A    He certainly did.

7        Q    When was that?

8        A    This was in September.  But I don't know the exact

9    date.

10       Q    Where was it?

11       A    In his office.

12       Q    Who else was there?

13       A    Himself and me.  Just himself.

14       Q    Just the two of you?

15       A    Just the two of us.

16       Q    Was the door closed?

17       A    Yes.

18       Q    When you left that room, did you tell anybody else

19   what he said to you?

20       A    No, not anyone in the office, I didn't.

21       Q    And you're sure it was just the two of you?  You're

22   sure it was just the two of you?

23       A    I don't know whether to say I'm sure or not.  Who

24   else would it have been?

ERNESTINE PARKER                                    174

1    you said anything to the effect that you thought your

2    position elimination was because of poor work performance?

3        A    That I wasn't able to keep up with all the work.

4        Q    Did you ever have a meeting with him where you told

5    him you thought the reason was because of your poor work

6    performance?

7        A    I don't remember telling him that.

8        Q    Do you recall his ever telling you it was not

9    because of work performance but rather because it was

10   because of business reasons for restructuring?

11       A    He did tell me he was reorganizing.

12       Q    Did he assure you that the position elimination was

13   not a result of work performance?

14       A    He was contradicting himself.  I was being called in

15   the office every day, complaints about my work habits.  But

16   they are just going to fire me because they are

17   reorganizing.  I was confused.  I thought that they were

18   getting rid of me because of all the mistakes and not able

19   to handle the extra workload.

20       Q    And, in fact, they told you that it was not because

21   of the mistakes but rather because of position elimination?

22       A    He said that he would say, when he terminated me, he

23   said he would say, we'll say it's reorganizing and that way

24   you will be able to collect unemployment.

1      Q      And also get severance, correct?

2      A      I suppose.

3      Q      What do you mean suppose?  He did offer you

4   severance, correct?

5      A      Yes, he did.

6      Q      Do you recall a meeting in October or any meeting

7   any time after the meetings with Mr. Annone along with Billy

8   Mosley to discuss all possible options available to you?

9      A      I don't recall.

10     Q      Do you recall a meeting with them ever?

11     A      There were lots of meetings.

12     Q      And what was discussed at these lots of meetings?

13     A      I can't remember.  That was three years ago.

14     Q      Was your job ever discussed?

15     A      You mean my job performance?

16     Q      No, your termination discussed at a meeting with

17   Mr. Mosley and Mr. Annone?

18     A      I don't remember what was discussed.

19     Q      Did they ever share with you that you could have

20   your severance package and you wouldn't be precluded from

21   pursuing a range of other job opportunities at Comcast?

22     A      I don't know.  I don't remember that.

23     Q      Do you recall them ever telling you that you could

24   have a job offer for a customer account representative?

1       A       You mean about my job?

2       Q       It says, plaintiff continued to refuse to resign in

3       spite of defendant's threats and intimidation.   That's what

4       you claim.

5       A       Okay.

6       Q       That's what you claim this man did to you and this

7       man is Mr. Mosley.  He is one of the defendants.   That he

8       threatened and intimidated you.

9               And my question is, who do you claim threatened

10      you?

11      A       Phil.  I mean Mr. Annone.  Because Phil was the one

12      that offered me the severance package; and, if I did not

13      accept it, they were going to continue to give me work, and

14      if I couldn't keep up with it, he would write me up, I would

15      be put on probation, which would eventually lead to

16      termination.  He said by accepting the severance package,

17      you will be able to collect unemployment.

18      Q       Yes.  And that's --

19      A       That sounds like a threat to me.

20      Q       That's paragraph 18.  That's paragraph 18 of the

21      complaint.  That's what you say in paragraph 18.  You say,

22      plaintiff was given an ultimatum.  There you said defendants

23      Mosley and Annone.  That if she did not resign and take a

24      severance package, they would increase the pressure and

1    additional work being assigned to her and she would be

2    written up and put on discipline, which would lead to her

3    termination for cause, which would disqualify her to

4    entitlement to unemployment benefits.  You say that in

5    paragraph 18.

6              Then in a separate allegation, you say,

7    plaintiff continued to refuse to resign in spite of

8    defendant's threats and intimidation.

9              Was it the same, that one instance?

10   A    I was just trying to hold onto my job for as long as

11   I could.

12   Q    That's not the question.  The question is whether

13   any other additional threats or statements to you that you

14   believed were threats?

15   A    I don't recall any other threats.

16   Q    You say defendants told plaintiff they developed a

17   large file on her which showed poor job performance since

18   her last favorable yearly employment review in July 2002.

19              You say defendants said that.  Who do you claim

20   told you that?

21   A    What was that now?

22   Q    That defendants told plaintiff they had developed a

23   large file on her which showed poor job performance since

24   her last favorably yearly employment review in July 2002.

ERNESTINE PARKER                                184

1                Who do you claim told you that?

2       A    Mr. Annone.

3       Q    So when you say defendants, you only mean Mr.

4    Annone?

5       A    Yes.

6       Q    Paragraph 22 says that on November 4th, 2002,

7    plaintiff's employment was terminated purportedly for poor

8    job performance.

9       A    Well, they were criticizing my work.  But, at the

10   same time, they were saying we are reorganizing.

11      Q    Go ahead.

12      A    And that was the reason why they were letting me go.

13      Q    In fact, you were told it was because of

14   reorganization and not your job performance, correct?

15      A    That's what I was told.

16      Q    Why do you allege that you were terminated for poor

17   job performance?

18      A    Because of all the complaints, you know, that

19   everyday nit-picking and everything that I was doing wrong.

20      Q    But, in fact, they told you it wasn't for poor job

21   performance, correct?

22      A    Yes, they did.

23      Q    All right.  And no one at Comcast ever told you you

24   were being terminated for poor job performance, correct?

1    A    Yes.

2    Q    And when you were at Comcast, the medicines you

3    took, did they allow you to do that work that you were doing

4    at night?

5    A    I do it because I had to.  I was fighting for my

6    job.  I'm not saying I felt better physically because I

7    wasn't having any pain.  I was fighting for my job.

8    Q    The medicines helped, though?

9    A    I think they helped.

10   Q    You mentioned that you weren't seeing any doctors

11   currently, correct?

12   A    I am not.

13   Q    Is that because you're feeling better?

14   A    No.  My benefits won't cover my doctor visits.

15   Q    What will your benefits cover?

16   A    My benefits are only for sick and accident.  It

17   doesn't cover any pre-existing illnesses.  So I don't go see

18   Dr. Carunchio anymore.

19   Q    Did you ever go look for a job that would cover

20   pre-existing illnesses?

21   A    No.

22   Q    How do you get your prescriptions?

23   A    I pay for them.

24   Q    Who prescribes them if you don't see a doctor?

Philip Annone                                                    4

1    Q.   To whom did you report?

2    A.   At the time?

3    Q.   Yes.

4    A.   When I started?

5    Q.   Yes, please.

6    A.   I had two reports.  I reported into Barbara

7    Edwards at the New Castle call center and I reported

8    into an HR VP at the time, who was I believe it was

9    Jim Sullivan.

10   Q.   What was Ms. Edwards' position, please, sir?

11   A.   I'm not exactly sure of her exact title.  I

12   believe she was the -- I'm not sure.  I don't know if

13   she was a director or VP.  I'm not quite sure.  I

14   don't know.

15   Q.   Were there employees who reported to you at the

16   time of the inception of your employment with Comcast

17   in New Castle?

18   A.   Yes, there was.

19   Q.   Who were they, please?

20   A.   Angela Wilson, Donna Minor, Kara Pietrowicz,

21   Ernestine Parker, Sandy Ricks, Edwin Gonzalez and

22   Alberina -- I'm not exactly sure of the pronunciation.

23   Q.   Ziemba?

24   A.   Ziemba.



Philip Annone

5

1     Q.   How about Ozoria Holman, did she report to you

2   too?

3     A.   No.  At first the payroll department, she was

4   part of payroll and payroll did not report directly

5   into me at first.

6     Q.   To whom did she report?

7     A.   I'm not sure where payroll started off with.

8     Q.   Did there come a time when she was part of your

9   report group?

10     A.   There was a time where she was part of my

11   report group.

12     Q.   Were any of those people hired by you?

13     A.   No, they were not.

14     Q.   Did you have authority to hire and fire?

15     A.   I'm not exactly sure what you mean by

16   "authority."

17     Q.   Beg your pardon?

18     A.   I'm not exactly sure what you mean by

19   "authority."  It wasn't my sole, I didn't have sole

20   authority to hire and fire.

21     Q.   Tell us what role you played in the hiring and

22   firing of employees, to make it easy.

23     A.   Sure.  As the human resources director, I would

24   provide in certain circumstances advice or counsel to

1  those managers and directors on hiring and firing.

2      Q.    Was anybody, in those first months of your

3  employment was anybody fired from HR without your

4  recommendation?

5      A.    I do believe not.

6      Q.    And did you recommend the termination in 2002

7  of Angela Wilson?

8      A.    I did.  I did recommend.

9      Q.    And did you recommend the termination of all of

10  the employees of the HR staff who worked under her

11  direction?

12      A.    I did not, no.

13      Q.    Did you recommend the termination of Alberina

14  Ziemba?

15      A.    I did, yes.

16      Q.    Did you recommend the termination of Donna

17  Minor?

18      A.    I did, yes.

19      Q.    And did you recommend the termination of Edwin

20  Gonzalez?

21      A.    I did, yes.

22      Q.    Did you recommend the termination of Kara

23  Pietrowicz?

24      A.    I did, yes.

1    Q.    And did you recommend the termination of

2    Ernestine Parker?

3    A.    I did, yes.

4    Q.    Did you recommend the termination of Ozoria

5    Holman?

6    A.    I did not, no.

7    Q.    What happened to her?

8    A.    I believe her supervisor had recommended

9    termination on her.

10   Q.    Who was her supervisor?

11   A.    I believe it was Elsa Aguilar.

12   Q.    And is Elsa Aguilar still employed at Comcast?

13   A.    Yes, she is.

14   Q.    What is her position today?

15   A.    She's a payroll supervisor.

16   Q.    Did you approve the recommendation that Ozoria

17   Holman be terminated?

18   A.    I did, yes.

19   Q.    How about Sandy Ricks, did you recommend that

20   she be terminated?

21   A.    I did not, no.

22   Q.    What happened to her?

23   A.    And I'm sorry.  I have to go back a moment.

24   Q.    Sure.



Philip Annone
8

1      A.    I apologize.

2            Ms. Ernestine Parker and Sandy Ricks, I

3   did not recommend their termination.   I apologize for

4   that.

5      Q.    That's okay.

6      A.    Oversight.

7      Q.    Did you play a role in their termination?

8      A.    I was asked whether or not as the HR director

9   that I thought that some changes in the call center

10  made sense and I thought that I would concur and agree

11  that they did at the time.

12     Q.    And that you then agreed to the termination of

13  Sandy Ricks and Ernestine Parker?

14     A.    Yes, I did.

15     Q.    Prior to your recommendation or the part that

16  you played in the termination of any of the people

17  that we have just talked about who worked in the HR

18  department, did you examine the personnel file of any

19  of the members of the staff that you participated in

20  their dismissal of?

21     A.    When you say, "examine," on occasion I would

22  have a need to go into a personnel file to file

23  something or put something away, but when you say,

24  "examine" I didn't go through and look at their

1    personnel file.  I may have looked at a document in

2    their personnel file.

3        Q.    Prior to making a recommendation of termination

4    would you examine the personnel file of the employees

5    routinely?

6        A.    Not always, no.

7        Q.    And, in fact, is it not the case that you

8    maintained a separate file for employees of the HR

9    department at New Castle in your office outside the

10   personnel file?

11       A.    I had files on the employees, some of the

12   employees in the HR department in my office that were

13   separate from the personnel file.

14       Q.    Which of the employees did you have separate

15   files on in your office?

16       A.    I can't recall actually.

17       Q.    Can you tell us which of the ones you did not

18   have separate files on?  I'll try it the other way.

19       A.    Unfortunately, I can't.  It's going back in

20   time.  I can't answer that with certainty.

21       Q.    Did you have a separate file on Ernestine

22   Parker?

23       A.    I did not, no.

24       Q.    Did you examine Ernestine Parker's personnel



1    for this particular review I saw this.

2      Q.    Well, let's talk about that.  All right?

3            MR. BATTAGLIA:   Would you mark this as

4    Annone No. 2 for identification, please?

5            (Annone Deposition Exhibit No. 2 was

6    marked for identification.)

7    BY MR. BATTAGLIA:

8      Q.    Mr. Annone, would you look at that document and

9    tell me whether or not you can identify it?

10     A.    (Reviewing document)  This appears to be a

11   partial employee performance review form.

12     Q.    And on page 259 there's some handwriting that

13   appears to me to be your handwriting.  Am I correct

14   that it is your handwriting?

15     A.    It does appear to be my handwriting, yes.

16     Q.    Do you recall making those comments?

17     A.    I don't recall making those comments, but it is

18   my handwriting.

19     Q.    And on the earlier pages there are marks and

20   notations, some increasing and some decreasing the

21   evaluations.

22            Do you recall making those notations?

23     A.    I don't recall making them, but it does appear

24   to be my writing.  Again, it would be a standard

Philip Annone                                    20

1    practice that I would provide recommendations to the

2    manager.

3              I guess if I could just clarify, I don't

4    recall making these actual changes, but I do in my

5    normal process and operating procedures review these.

6    Q.    Would you take a look at page 258, please?

7    A.    Yes, sir.

8    Q.    Paragraph number 6, it appears as if you are

9    changing the evaluation for that sixth paragraph from

10   a 3 to a 3.5.  Is that correct?

11   A.    It does look like I had increased that,

12   correct.

13   Q.    What is that trait that you were asked to

14   comment on there, please, sir?

15   A.    "Is honest and behaves ethically and with

16   integrity."

17   Q.    And why were you increasing the rating there

18   from 3 to 3.5?

19   A.    I can't recall.  It's a while ago.

20   Q.    Do you believe it would have reflected your

21   honest opinion at the time you made the suggestion?

22   A.    Yeah.  I believe that it would reflect how I

23   felt, yes, at the time.

24   Q.    And on page 259.

Philip Annone

1     A.    Yes, sir, I'm there.

2     Q.    Again, paragraph number 6.  It's not numbered,

3     but it's the sixth paragraph there.  She's rated a 4,

4     which is the highest possible rating.  Is that not so,

5     sir?

6     A.    That is correct.

7     Q.    And the category is "Organize and maintain

8     office files and record system."  Would you tell us

9     for the record what your comments were?

10    A.    I wrote "Great, great, takes initiatives."

11    Q.    Again, can we assume that if you made that

12    comment that it was based on your honest judgment at

13    the time?

14    A.    Yes.

15    Q.    You can lay that aside now, if you would like.

16    You can give it to the court reporter.

17          Those evaluation forms, especially the one

18    done by Billy Mosley, contains a blank signature line

19    for Billy Mosley's next reporting supervisor.  Would

20    you have been the next reporting supervisor?

21    A.    May I see the document?

22    Q.    Sure.  I think it's page 175, Mr. Annone.

23    A.    Yes.  It's usually the manager's supervisor.

24    Q.    Was there any reason why --

Philip Annone                                          26

1      A.    Personnel file.

2      Q.    Thank you.

3            Are you aware of Comcast's progressive

4   discipline process?

5      A.    I am.   Yes, I am as director of human

6   resources.

7      Q.    Has there ever been the beginning of any

8   progressive discipline process for Ernestine Parker?

9      A.    I do not believe so.   I believe that there was

10  no progressive discipline, to my knowledge.

11     Q.    Are you aware of the performance improvement

12  plan documents that are used at Comcast?

13     A.    I am, yes.

14     Q.    Was there ever any use or offer of any

15  performance improvement plan document for Ernestine

16  Parker?

17     A.    I don't know.   Her manager, Billy Mosley, may

18  have had her level of performance improvement, whether

19  it be through coaching, counseling, but I really don't

20  know.

21     Q.    You recommended her severance or termination.

22  At the time you recommended her severance or

23  termination, did you check to see whether or not there

24  were any performance improvement plan documents in her

Philip Annone

42

1    Q.    Why was it prepared?

2    A.    I believe that Mr. Fidel Edwards at the time

3    the decision was made to eliminate the administrative

4    positions he had asked me if I concurred.  I told him

5    that I supported that decision and that I felt that

6    the department could benefit from another skilled

7    generalist role and he said, "Provide that to me in

8    writing."

9    Q.    Do you know of any other writing dated before

10   July 2002 in which the subject of the possible

11   restructuring of this magnitude was discussed?

12   A.    When you say, "this magnitude," I'm sorry, I'm

13   not sure I understand that.

14   Q.    Well, whatever the magnitude of your

15   recommendations were.

16   A.    I don't know the answer to that.  As an HR

17   director, I'm always examining the best, you know,

18   structure and operation for my department that best

19   utilizes and services the internal and external

20   customers, so that's an ongoing process for me.

21   Q.    Is this the first document of which you are

22   aware that talks about this restructuring?

23   A.    I'm not sure.  I may have had a draft out

24   there.  I don't know.  I just know that this document

Philip Annone
43

1    is the one that I know of now, but I don't know if one

2    existed before this.

3        Q.    Is there anything that you can think of that

4    suggests to you that one existed before this?

5        A.    No, there's nothing that I can think of.

6        Q.    This plan or the recommendation that you have

7    here, upgrade the administrative assistant position to

8    HR administrator, it talks about a new position to be

9    paid 30-35,000 dollars annually.

10              Was anybody hired in that position?

11       A.    No.

12       Q.    And is there anything in writing indicating

13   that this recommendation is not to be followed

14   through?

15       A.    No, not that I'm aware of.

16       Q.    And, of course, it is here that you indicate

17   that it would be inappropriate to place her in another

18   position because of the confidentiality problem?

19       A.    I did read that, yes.

20       Q.    Let me ask you to identify this.

21              MR. BATTAGLIA:  Mark this as 8, please.

22              (Annone Deposition Exhibit No. 8 was

23   marked for identification.)

24



WILCOX & FETZER LTD.
Registered Professional Reporters

Philip Annone

50

```
 1              THE WITNESS:  Very good.  Thank you.
 2              (A brief recess was taken.)
 3              MR. BATTAGLIA:  The next number, No. 10.
 4              (Annone Deposition Exhibit No. 10 was
 5      marked for identification.)
 6      BY MR. BATTAGLIA:
 7         Q.   Can you identify that document, Annone No. 10,
 8      Bates No. 175?
 9         A.   It appears to be a note typed up by Mr. Billy
10      Mosley.
11         Q.   Did it go to you?
12         A.   I don't believe it did, no.
13         Q.   In it he says, "On August 5," in part, "I
14      discussed Ernie's medical condition along with her
15      ability to handle the volume of work," et cetera.
16              Did he have that discussion about her
17      medical condition with you?
18         A.   He did not, no.
19         Q.   He never had that discussion with you?
20         A.   I don't know what he means by "medical
21      condition," no.  We had talked at some point in time
22      after her collapse about headaches.
23         Q.   And that's the only discussion you had with him
24      about medical condition?
```

1    A.    Yes, sir, as far as I can recall.

2    Q.    What did that discussion consist of?

3    A.    That he was concerned for Ms. Parker's health

4 and that she had indicated that she had headaches and

5 that he was concerned.

6              MR. BATTAGLIA:  Cross-examine, please.

7              MR. LANGEL:  No questions.  Read and sign.

8              (Deposition concluded at 2:15 p.m.)

9

10                  I N D E X

11 DEPONENT:  PHILIP ANNONE                    PAGE

12     Examination by Mr. Battaglia              2

13

14                 E X H I B I T S

ANNONE DEPOSITION EXHIBITS                   MARKED

15 1 Document Bates stamp numbered 0176-0181      17

16 2 Document Bates stamp numbered 0257-0263      19

17 3 Document Bates stamp numbered 0100           27

18 4 Document Bates stamp numbered 0190           36

19 5 Document Bates stamp numbered 0191           38

20 6 Document Bates stamp numbered 0192           40

21 7 Document Bates stamp numbered 0272-0274      41

22 8 Document Bates stamp numbered 0275           43

23 9 Document Bates stamp numbered 0165-0168      47

24

Billy G. Mosley                                        8

1    Initially I believe there were approximately 600

2    employees.   There's over 800 employees now.

3        Q.    But how many in your department?

4        A.    Nine.

5        Q.    Nine.   How many were in your department when

6    you were first hired?

7        A.    Let's see.   Six, I believe.

8        Q.    All right.   Now, was Ernestine Parker one of

9    the employees that was in your department when you

10   were first hired?

11       A.    Yes, she was.

12       Q.    What were her duties at that time, please, sir?

13       A.    Her initial duties were to support the

14   generalists and also handle bereavement, birthdays,

15   send out cards for newborn babies, keep track of our

16   PAN process, personal action notice, and those kind of

17   duties.

18       Q.    Did her duties change at all from the date when

19   you were hired until she was terminated?

20       A.    Yes.   They started to increase.

21       Q.    Tell me, first of all, why they increased.

22       A.    Because the activity in the department, there

23   were more activity, more demands on our department.

24       Q.    Is there a reason for that?

Billy G. Mosley                              16

1    terminology.

2        Q.    Tell us what you understand it to be in your

3    terminology.

4        A.    In my terminology?

5        Q.    Yes, sir.

6        A.    Counseling is if there's a performance issue

7    that I need to help an employee correct, give them

8    feedback and development.

9        Q.    In your terminology then from March to July

10   there was no need to counsel Ms. Ernie?

11       A.    From March to July?

12       Q.    Yes, sir.

13       A.    No, I don't believe so.

14       Q.    Okay.   Thank you.

15              Now, can you tell us when in July you

16   counseled her?

17       A.    I'm not sure of the dates.   There were several

18   dates.   I mean, we would meet on a daily basis through

19   the latter part and early on I think we met on a

20   weekly basis.

21       Q.    Was that after you came back from vacation in

22   July that you had these counseling sessions that

23   you've referred to?

24       A.    No.   I believe they started before I went on

1    Do I understand your title correctly?

2        A.    That's correct.

3        Q.    Did you ever become aware that Ms. Ernie had

4    applied for a FMLA leave, a F-M-L-A leave?

5        A.    I became aware of that application I believe on

6    August 13th, somewhere around that area.

7        Q.    And you didn't know about it before that time?

8        A.    No, I did not.

9        Q.    Did you talk to Holly McCracken about it on

10   August the 13th?

11       A.    Yes.

12       Q.    And you had no contact with Holly McCracken

13   about it prior to that time?

14       A.    No, I did not.

15       Q.    How did you become aware of the application at

16   that time, the FMLA application on August the 13th?

17       A.    I believe Holly brought it to my attention.

18       Q.    Do you remember what the basis was for

19   Ms. Ernie's application for FMLA leave?

20       A.    I think the basis was a chronic illness.

21       Q.    Do you remember the specific nature of the

22   chronic illness?

23       A.    Headaches.

24       Q.    Was it migraine headaches?



Billy G. Mosley

20

1    A.    It did not specifically say migraines.  It just

2    said headaches.

3    Q.    It did not.

4         Were you present in August of 2002 when

5    Ms. Ernie collapsed at work?

6    A.    I believe it was the 1st, August 1st, 2002.

7    Q.    August 1st.  All right.  You were present?

8    A.    Yes, I was.

9    Q.    Did you learn what the cause of her collapse

10   was?

11   A.    No.

12   Q.    You never talked to her about the cause of it?

13   A.    I asked her.  She wasn't sure of the cause or

14   why she collapsed, but she did tell me that she had

15   headaches.

16   Q.    The complaints from Bethany Pace, can you tell

17   me when they began?

18   A.    I believe it was beginning of July, the end of

19   June.

20   Q.    And in July of 2002, did you have a

21   conversation with Ms. Parker warning her that she had

22   had to improve her job performance and handle all of

23   her additional duties?

24   A.    No.  I believe that was in June during our

1    a need to send out an offer letter to an employee,

2    potential new employee, and all information was not

3    completed and it was not, the task was not completed

4    on time.

5       Q.   Now, you told us you kept a separate file, a

6    manager's file with respect to Ms. Ernie.  Is that

7    correct?

8       A.   That's correct.

9       Q.   And do I understand that all of those materials

10   were not in Ms. Ernie's personnel file on a day-to-day

11   basis?  Is that correct?

12      A.   That's correct.

13      Q.   And they were placed in her file after she

14   left?

15      A.   The files were combined.  Anything that I had

16   would have been combined with other files that we had.

17      Q.   Did that happen after she was terminated?

18      A.   Yes.

19      Q.   Mr. Mosley, did there come a time when you

20   learned that Ms. Parker was targeted for termination

21   at Comcast?

22      A.   Yes.

23      Q.   When was that, please, sir?

24      A.   I believe it was mid-August.

Billy G. Mosley                                    25

```
1        Q.    All right.

2              MR. BATTAGLIA:  Excuse me just a second.

3              (Discussion off the record.)

4    BY MR. BATTAGLIA:

5        Q.    How did you learn that she was targeted for

6    termination?

7        A.    From Mr. Annone.

8        Q.    Tell me when that happened and what was the

9    occasion.  What were the circumstances about your

10   learning it?

11       A.    I believe Mr. Annone was making me aware of the

12   budgetary process.  We normally go through a budgetary

13   process and there's certain items that I might be

14   responsible for and there's other items that he's

15   responsible for.

16       Q.    And how did the issue of the termination of

17   Mrs. Parker come up during that conversation?

18       A.    Mr. Annone made me aware that there probably

19   would be downsizing because of budgetary constraints.

20       Q.    And did he tell you what the basis or did you

21   tell him what the basis for the termination of her

22   employment was to be?

23       A.    I'm not sure if I understand "the basis."

24       Q.    What did you find out why she was terminated,
```



Billy G. Mosley

30

1    A.    No, he did not.

2    Q.    Did he see it?

3    A.    I believe he did.

4    Q.    And was it you that did all of the evaluations

5    and so forth?

6    A.    Yes, I did.

7    Q.    And there is sort of a summary, is there not,

8    in here on page 179?

9    A.    Yes.

10   Q.    And is it true that she was regarded by you at

11   least as having performed the requirements of her

12   position?  Was that your evaluation?

13   A.    Yeah.  She was meeting the requirements of the

14   position.

15   Q.    And that she had been a solid contributor to

16   the team's overall performance?

17   A.    Correct.

18   Q.    And that she had the background and skills to

19   become an outstanding part of the human resource team?

20   A.    Yes.

21   Q.    And that she should become more assertive.  Is

22   that correct?

23   A.    That's correct.

24   Q.    All right.  Now, I note on page 180 there's a

1    list of new goals for her also.  Were they put in by

2    you?

3        A.    Yes.  Ms. Ernie and I talked about these goals

4    and we agreed on them.

5        Q.    Did anybody else participate in any of the

6    formulation of this employee performance review that

7    you have identified as being your own?

8        A.    As far as giving me some feedback?

9        Q.    Yes.

10       A.    Yes.  Mr. Annone gave me some feedback.

11       Q.    And what was his feedback?

12       A.    His feedback was over the course of time,

13   basically what I have here, is that Ms. Ernie had

14   contributed to the overall effectiveness of the

15   department and she was meeting, overall she was

16   meeting the requirements of the job.

17       Q.    Were there any deficiencies cited in this

18   report that you prepared?

19       A.    There's some areas for improvement in this

20   review.

21       Q.    Anything that you regarded as deficiencies,

22   however?

23       A.    I'm not sure -- when we look at the evaluation,

24   the rating system does not say deficiency.  What the

Billy G. Mosley                                              32

1    rating system goes by is solid, moderate,

2    unsatisfactory.

3            There were areas here that she partially

4    met the requirements of the job and there were areas

5    that she met the requirements of the job.  If you are

6    asking me was she deficient, then that's not the

7    terminology that we have on this file.

8    Q.    Now, did you do an earlier draft of this

9    evaluation?

10   A.    I probably did.

11   Q.    Let me ask you if you can identify this next

12   document for us while I get it out.

13   A.    Okay.

14            MR. BATTAGLIA:  John, I have a copy for

15   you.

16            MR. LANGEL:  Thank you.

17            MR. BATTAGLIA:  Would you mark this

18   document as Mosley No. 2, please, for identification?

19            (Mosley Deposition Exhibit No. 2 was

20   marked for identification.)

21   BY MR. BATTAGLIA:

22   Q.    Would you take a careful look at that document

23   which is Bates numbered 257 to 263 and tell me if you

24   can identify it?



Billy G. Mosley
33

1    A.    This is one of our evaluation forms.

2    Q.    Okay.  It was in the production that your

3    lawyers have provided us, Mr. Mosley, and I'm trying

4    to figure out where it came from.

5           Can you tell me?

6    A.    From the looks of this, the handwriting looks

7    like it's Mr. Annone's handwriting, but it doesn't

8    have any...

9    Q.    I'm sorry?

10   A.    It could have been one of the initial copies

11   that I initially, my first draft of the review.

12   Q.    But it's not your handwriting on it, is it?

13   A.    No, it's not.

14   Q.    You believe it to be Mr. Annone's handwriting?

15   A.    I believe so.

16   Q.    I notice that some of the ratings are

17   apparently higher on this one than on the one that you

18   did.

19           MR. LANGEL:  Objection.

20   Q.    Is that a fair observation, please?

21           MR. LANGEL:  Higher and lower?

22           MR. BATTAGLIA:  I didn't see, on this

23   draft, John, I don't see any lower ones.  They seem to

24   be higher.

Billy G. Mosley                                    34

1          If there's some lower, if you will call

2     them to our attention I will be happy to ask about

3     them.

4     A.    There are.  There's lower and higher.

5     Q.    Where are the lower ones, Mr. Mosley, please?

6     A.    If we look at 258, the third item from the top.

7     Q.    258?

8     A.    Yes.

9     Q.    It looks like Mr. Annone's is higher.  It's got

10    typed in 3 and somebody has put 2.5 there, right?

11    A.    Yes.  2.5 is lower than what was actually in

12    there.

13    Q.    In your report you put 2.5, didn't you?

14    A.    Yes.

15    Q.    Well, when this came from Mr. Annone it was

16    typed in 3, wasn't it?

17    A.    No.  This would have been me giving it to

18    Mr. Annone.

19    Q.    Okay.  Let me back up then.

20          We have got this unexecuted evaluation.

21    A.    Right.

22    Q.    Where did it originate?  Who started it?

23    A.    More than likely, I believe, not having seen my

24    name on this, but nine times out of ten it would have

Billy G. Mosley                                    35

1    come from me.

2        Q.    It would have come from you?

3        A.    Right.

4        Q.    And then it went to Mr. Annone?

5        A.    Right.

6        Q.    The handwriting on here, was it put on by

7    Mr. Annone?

8        A.    I believe so.

9        Q.    So that in some cases Mr. Annone decreased the

10   evaluations?

11       A.    He decreased some and increased another.

12       Q.    And I noticed on this one that you apparently

13   sent to Mr. Annone that page 261 has no entries?

14       A.    That's correct.

15       Q.    And was that changed in the final evaluation

16   that you did?

17       A.    No.   260 would not apply to Ms. Parker because

18   it's a supervisory standard so it would not apply to

19   her.

20       Q.    And under new goals, there were no new goals

21   set forth on this one, the draft that you had

22   initially sent to Mr. Annone?

23       A.    No.   Usually during the draft the goals would

24   not be set until later.   Usually what I would do is go

Billy G. Mosley

36

1    through and complete the evaluation and the rating.

2        Q.    Would it be a burden for you to tell us which

3    ones Mr. Annone increased the evaluation, in other

4    words, gave her a better grade than you did?

5        A.    According to this document, right?

6        Q.    Yes, sir.

7        A.    According to this document, the fifth item on

8    258 was increased to a 3.5.  It was a 3.

9                MR. LANGEL:  Actually, I think that's the

10   sixth if you count.

11               THE WITNESS:  Sixth.  Sorry.  Yes, sixth.

12               MR. BATTAGLIA:  Thank you, John.

13   BY MR. BATTAGLIA:

14       Q.    Anything else?

15       A.    No.  That's the only one.

16       Q.    All right.  Now, in doing the evaluation is

17   that something that you do over a period of time or do

18   you sit down one night and crank it out?

19       A.    Well, the information that you are accumulating

20   is over a period of time.

21       Q.    I understand.

22       A.    The documentation of that can take me a few

23   days.  It's very rarely that I can get it done in one

24   day.

Billy G. Mosley                                          41

1      Q.    Do you believe that this differs from your

2  evaluation that you did in June of 2002?

3      A.    I believe some of the items would have been,

4  yes.

5      Q.    Do you know what it was that changed that made

6  you write this letter?

7      A.    This is documenting the coaching that I had

8  given to Ms. Ernie in reference to her performance and

9  just my observation over the past couple of months.

10     Q.    Was this prepared after a time when it was

11 determined that she would be targeted for termination?

12     A.    I don't believe so.

13     Q.    Was it before she was targeted for termination?

14     A.    I'm not sure.

15     Q.    You're not sure?

16     A.    Right.  I believe -- this is dated August 16th.

17 And I'm not sure.  I believe it was mid-August when I

18 learned about the reduction of the positions, so it

19 could have been before August 16th or after August

20 16th.  It could have been.

21     Q.    If you refer to the letter, the last paragraph,

22 it says, "On August 5, I discussed Ernie's medical

23 condition along with her ability to handle the volume

24 of work."



Billy G. Mosley                                42

1            Tell me what that discussion was.

2    A.    Oh, that was a discussion that I had with Ernie

3 to make sure, because I was very concerned about her

4 health, I wanted to make sure that she was okay and

5 how was she doing on a daily basis.

6    Q.    Were you concerned that her medical condition

7 would affect her ability to perform her job?

8    A.    That was my question to her.

9    Q.    That was a concern that you had?

10   A.    Well, yes.

11   Q.    Okay.  And later on in the letter you speak

12 about her inabilities as having a negative impact on

13 the performance of primary job functions in this

14 department.

15            That's significantly different from your

16 evaluation on June 21st, isn't it?

17            MR. LANGEL:  Objection.

18            MR. BATTAGLIA:  Thank you.

19   A.    Yes, it is.

20   Q.    And the reason for the difference?

21   A.    Is because Ms. Ernie was not completing tasks

22 through my observation of that time frame.

23   Q.    And that was not the situation prior to your

24 evaluation on June 21st?

**(Comcast**

# EMPLOYEE PERFORMANCE REVIEW FORM



| Employee ID: | 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 | Supervisor: | Billy G. Mosley |
| Employee Name: | Ernestine Parker | Review Date: | 7/01/2002 |
| Position Title: | Administrative Assistant | Last Review Date: | 7/2/2001 |
| Department: | Human Resource | Supervisor Offer: | ○ Yes  ◉ No |
| Division: | Cable | | |

## GENERAL INSTRUCTIONS

This form is to be used to review the performance of all Comcast employees.

Both the manager and the employee should sign and date the review after completing the performance review session. Forward a copy of the signed performance review to the Human Resources Department.

## RATING INSTRUCTIONS

In the box next to each performance item, rate the employee's performance level using the following guidelines:

| RATING | DESCRIPTION |
|--------|-------------|
| 4 | **Outstanding** (exceeds performance expectations/requirements) |
| 3.5 | |
| 3 | **Solid** (meets performance expectations/requirements) |
| 2.5 | |
| 2 | **Moderate** (partially meets performance expectations/requirements) |
| 1.5 | |
| 1 | **Unsatisfactory** (does not meet performance expectations/requirements) |
| N | **Not Observed** (performance not observed or not applicable) |

Original - To Personnel File, Human Resources Dept.
Copy - To Employee



DEPOSITION
EXHIBIT
Mosley 1
1026-03RF

Comcast-Parker
01701



## SECTION A.  PERFORMANCE STANDARDS AND EXPECTATIONS

This section applies to all employees.  Additional performance factors that apply specifically to the employee and/or department can be added in Section A1.

| RATING | PERFORMANCE FACTOR |
|--------|--------------------|
| 3 | Keeps the appropriate people informed and aware of all activities in the processes of work and those activities as significant in that of the department |
| 4 | Treats all employees respectfully by being cooperative, helpful, courteous and respectful |
| 2.5 | Is proactive in recommending ways to improve the department's work processes and products |
| 2.5 | Stays focused on the department, customers and their needs, and promptly employs ways in which to handle service situations |
| 4 | Treats everyone fairly and impartially, and ensures conduct as others complying within the department policies |
| 3 | Is honest and behaves ethically and with integrity |
| 3 | Reports to and remains at work on time and ready for productive employment each day |
| 2 | Takes responsibility for ensuring a safe, healthy work environment to prevent injuries, and avoids eliminating unnecessary hazards |
| 3 | Readily accepts and meets ownership of work assignments, job duties, and performance standards and goals |
| 2 | Utilizes all necessary components and tools required for successful execution of work assignments as authorized |
| 2.90 | AVERAGE RATING FOR SECTION A |

**COMMENTS FOR SECTION A.**

Original – To Personnel File, Human Resources Dept.
Copy – To Employee

Page 2 of 6

Comcast-Parker
0177B-95



## SECTION A1.  CUSTOM PERFORMANCE FACTORS

Define custom performance standards that apply specifically to the employee or department in the spaces provided below.  Rate each performance factor that is added.

| RATING | PERFORMANCE FACTOR |
|---|---|
| 3 | Assure the accurate production of various documents |
| 2 | Fax, copy, and distribute material as necessary |
| 2 | Assure accuracy of Human Resource Attendabnce Controller |
| 2 | Provides Aministrative Support for Human Resource Department |
| 2 | Conduct clerical research and reports |
| 3 | Organize and maintain office files and record system |
| 4 | Assure controlled access to confidential materials |
| 3 | Screen telephone calls, answer routine questions, and furnish information |
| 3 | Assist HR as needed and back up receptionist as needed |
| 2 | Attend management meetings, prepare and distribute agenda and minutes |
| 2.60 | AVERAGE RATING FOR SECTION A1 |

**COMMENTS FOR SECTION A1.**

Original - To Personnel File, Human Resources Dept.
Copy - To Employee

Page 3 of 6

Comcast-Parker
0173-96



## SECTION C.   PREVIOUS GOALS

List the business goals that had been established for the past year. Rate each goal using the numerical rating system, based on performance relative to these goals.

| RATING | GOAL |
|--------|------|
| 2 | Human Resource staff support |
| 4 | Handle special HR Projects. (Company Picnic, Employees free PC's, Comcast Care Day, Team Leaders Security Guide Lines, etc.) |
| 2 | Responsible for processing the Call Ctr's W4 forms, Direct Deposit forms, Employee Change forms |
| 4 | Responsible flower delivered to Call Center Employees, for bereavement and hospital stay. Order monogram baby blankets for new mothers and fathers. |
| 3 | Responsible for keeping tract of HR employee's attendance record. |
| 3 | Responsible for HR's  Sunshine Club (Birthdays, Baby Showers, Bereavement, and Hospital |
| 3 | Responsible for keeping tract of employees punch detail from the Team Leaders |
| 3 | Assist payroll with posting leave request forms in the Attendance Controller. |
| 3 | Assist payroll with check sorting during pay week. |
| 3 | Cover switchboard during the Receptionist's breaks, lunch hour, and time out of the office. Assit in the upkeep of filing |
| 3.00 | AVERAGE RATING FOR SECTION C |

## COMMENTS FOR SECTION C.

Ernie's performance has been meeting the requirements of her position and she has been a solid contributor to our team's overall performance. Ernie has the background and skills to become an outstanding part of the Human Resource Team. She needs to become more assertive in seeking opportunities to assist the team in individual functions. A better understanding of the pace of service needed to satisfy our customers will increase her effectiveness as part of the Team's overall ability to provide HR products and Services to our Customers.

Original - To Personnel File, Human Resources Dept.
Copy - To Employee

Comcast-Parker
0179-97



## SECTION D.  NEW GOALS

List the business goals established for the next review period.  Address how performance will be assessed.

| GOALS | ELEMENTS OF GOAL ASSESSMENT |
|---|---|
| Enhance Skills and Abilities that will improve individual and team service of our customers | Take courses and attend Seminars that will improve and develop new skills. Learn applicable changes to Company's general policies and procedures. |
| Maintain a high level of greeting service to our customers | Cover Receptionist's desk during breaks and time out of the office. Make responsible arrangements for bereavement, new parents and promotions. |
| Process PAN Forms | Ensure the accuracy of PAN's for yearly reviews, promotions, new hires and terms. |
| Maintain current information in HR turnstyle. | Monitor the form levels, dates and arrangments to ensure user friendly format for Employees |
| Support Human Resource Team | Assist in filing , making projects deadlines, providing HR products and Services to NCCC Employees and type correspondences for team. |
|  |  |
|  |  |
|  |  |
|  |  |

Original – To Personnel File, Human Resources Dept.
Copy – To Employee

Page 5 of 6

Comcast-Parker
0189-98



## SECTION E.  CAREER DEVELOPMENT & TRAINING NEEDS

Identify personal/career development needs and areas in need of improvement. Discuss with the employee and record the agreements and understandings below to use as a reference in future performance and career-related discussions.

*Improve knowledge of Company policies and procedures by reading and keeping current of updates.

Attend Learning Seminars/Courses to improve skills in Administration Functions (word, excel, power point, etc.) minimum of 1 course or seminar by July 1, 2002.

## SECTION F.  OVERALL PERFORMANCE RATING

2.875

Employee Signature _Ernestine Parker_    Date 6-21-02

Direct Supervisor _Billy J. Mosley_    Date June 21, 2002

Next Reporting Sup    Date

HR Rep Signature _Michael D Battey_    Date 6/21/2002

Original - To Personnel File, Human Resources Dept.
Copy - To Employee

Comcast-Parker
018B-99

 **COMCAST**

## SECTION C.  PREVIOUS GOALS

List the business goals that had been established for the past year. Rate each goal using the numerical rating system, based on performance relative to these goals.

| RATING | GOAL |
|---|---|
| 2 | Human Resource staff support |
| 4 | Handle special HR Projects. (Company Picnic, Employees free PC's, Comcast Care Day, Team Leaders Security Guide Lines, etc.) |
| 2 | Responsible for processing the Call Ctr's W4 forms, Direct Deposit forms, Employee Change forms |
| 4 | Responsible flower delivered to Call Center Employees, for bereavement and hospital stay. Order monogram baby blankets for new mothers and fathers. |
| 3 | Responsible for keeping tract of HR employee's attendance record. |
| 3 | Responsible for HR's  Sunshine Club (Birthdays, Baby Showers, Bereavement, and Hospital |
| 3 | Responsible for keeping tract of employees punch detail from the Team Leaders |
| 3 | Assist payroll with posting leave request forms in the Attendance Controller. |
| 3 | Assist payroll with check sorting during pay week. |
| 3 | Cover switchboard during the Receptionist's breaks, lunch hour, and time out of the office. Assit in the upkeep of filing |

| 3.00 | AVERAGE RATING FOR SECTION C |
|---|---|

## COMMENTS FOR SECTION C.



##############################################################################################

Original - To Personnel File, Human Resources Dept.
Copy - To Employee

Page 4 of 6



DEPOSITION
EXHIBIT

Comcast-Parker
0257

B-100

# COMCAST

## SECTION A.  PERFORMANCE STANDARDS AND EXPECTATIONS

This section applies to all employees.  Additional performance factors that apply specifically to the employee and/or department can be added in Section A1.

| RATING | PERFORMANCE FACTOR |
|---|---|
| 3 | |
| 4 | |
| 3 | |
| 3 | |
| 4 | |
| 3.5 | |
| 3 | |
| 3 | |
| 3 | |
| 2 | |
| 3.10 | AVERAGE RATING FOR SECTION A |

## COMMENTS FOR SECTION A.

Original - To Personnel File, Human Resources Dept.
Copy - To Employee

Page 2 of 6

Comcast-Parker
0258

B-101



## SECTION A1.  CUSTOM PERFORMANCE FACTORS

Define custom performance standards that apply specifically to the employee or department in the spaces provided below.  Rate each performance factor that is added.

| RATING | PERFORMANCE FACTOR |
|--------|---------------------|
| 3 | Assure the accurate production of various documents |
| 2 | Fax, copy, and distribute material as necessary |
| 3 | ~~Search Internet for Comcast related articles~~ *Provides Admin Support for HR. Dept.* 2 |
| 3 | ~~Maintain Vice President's calendar~~ |
| 3 | Conduct clerical research and reports |
| 4 | *GREAT* Organize and maintain office files and record system *GREAT Take Initiatives* |
| 4 | Assure controlled access to confidential materials |
| 3 | Screen telephone calls, answer routine questions, and furnish information |
| 3 | Assist HR as needed and back up receptionist as needed |
|  | Attend management meetings, prepare and distribute agenda and minutes |

| 3.10 | AVERAGE RATING FOR SECTION A1 |
|------|-------------------------------|

## COMMENTS FOR SECTION A1.

Original - To Personnel File, Human Resources Dept.
Copy - To Employee

Page 3 of 6

# Comcast

Review for Ernestine Parker
Employee Performance Review

## SECTION B.  SUPERVISORY STANDARDS AND EXPECTATIONS

This section applies to managers who supervise employees.  Additional performance factors that
apply specifically to the employee and/or department can be added in Section B1.



## COMMENTS FOR SECTION B.

Original - To Personnel File, Human Resources Dept.
Copy - To Employee

B-103
Comcast-Parker
0260



## SECTION B1.  CUSTOM SUPERVISORY PERFORMANCE FACTORS

Define custom supervisory performance standards that apply specifically to the employee or department in the spaces provided below.  Rate each performance factor that is added.



| RATING | PERFORMANCE FACTOR |
|--------|--------------------|
|        |                    |

**AVERAGE RATING FOR SECTION B1**

## COMMENTS FOR SECTION B1.



Original - To Personnel File, Human Resources Dept.
Copy - To Employee



## SECTION C.  PREVIOUS GOALS

List the business goals that had been established for the past year.  Rate each goal using the numerical rating system, based on performance relative to these goals.

| RATING | GOAL |
|---|---|
| 3 | Human Resource staff support |
| 4 | Handle special HR Projects. (Company Picnic, Employees free PC's, Comcast Care Day, Team Leaders Security Guide Lines, etc.) |
| 3 | Responsible for processing the Call.Ctr's W4 forms, Direct Deposit forms, Employee Change forms |
| 4 | Responsible flower delivered to Call Center Employees, for bereavement and hospital stay. Order monogram baby blankets for new mothers and fathers. |
| 3 | Responsible for keeping tract of HR employee's attendance record. |
| 3 | Responsible for HR's  Sunshine Club (Birthdays, Baby Showers, Bereavement, and Hospital |
| 3 | Responsible for keeping tract of employees punch detail from the Team Leaders |
| 3 | Assist payroll with posting leave request forms in the Attendance Controller. |
| 3 | Assist payroll with check sorting during pay week. |
| 3 | Cover switchboard during the Receptionist's breaks, lunch hour, and time out of the office. Assit in the upkeep of filing |
| 3.20 | AVERAGE RATING FOR SECTION C |

## COMMENTS FOR SECTION C.



---

Original - To Personnel File, Human Resources Dept.
Copy - To Employee

Page 4 of 6

B-105
Comcast-Parker
0262

COMCAST

## SECTION D.  NEW GOALS

List the business goals established for the next review period.  Address how performance will be assessed.



| GOAL | ELEMENTS OF GOAL ASSESSMENT |
|---|---|
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |

Comcast-Parker
0263

August 16, 2002

**Ernestine Parker**
**HR Assistant**

**Job Performance**

I have over the past couple of months discussed the needs to perform the duty of HR Assistant at a level that is totally supportive to the entire HR Team with Ernie. Since July 1, 2002 Ernie and I have had numerous discussion concerning her over all performance, those discussion include the ones listed below but are not limited to and doesn't include in the moment feedback. I reviewed Ernie's annual performance with her on June 21, 2002 that included areas for improvements. We discussed specific areas where she could improve in that would better support the HR Team. They include clerical support, walk in support, daily functional support that aid each member of the HR Team to perform their jobs in an efficient manner. Over the last two months Ernie has not been able to support the HR Team in an effective manner:

- She was asked to prepare an offer letter for a CAE Online position and a UPS express envelope. She completed the wrong letter and used the wrong type of envelope.
- Creating an offer letter & packet for a new hire missing the deadline by two days
- Completing file history information, employee folder attachments and logging in background information on new hires completed five days after the task due date.
- Making basic errors on schedules, appointment notices.
- Taking four hours to complete five job descriptions that only needed to be retyped.
- Unable to mail merger email documents which contain information for job postings to be sent to outreach groups.
- Unable to prepare mailing labels without repeated assistance from several employees

On August 5, I discussed Ernie's medical condition along with her ability to handle the volume of work that is required for the HR Assistant position. July 30, we discussed the need to complete projects by the due date. July 29, discussed the lack of comprehending tasks that are given to her. July 24, discussed projects being completed late. July 23, discussed basic typing errors when completing our weekly schedule. July 22, discussed the need to handle high volume of work and support for the HR Team.
Ernie has not demonstrated the ability or capacity to perform the essential duties need as an HR Assistant in New Castle Call Center. Her inabilities has negative impacts on the performance of primary job functions in this department, service to our customers and creates a high level of frustration for each member of the Team who depend on her support.

Billy G. Mosley



DEPOSITION EXHIBIT
Mosley 3
10.26.05 KF

Comcast-Parker
0175

## INTEROFFICE MEMORANDUM

**TO:**       FIDEL EDWARDS, JOHN MACGOWAN
**FROM:**     PHILIP T. ANNONE
**SUBJECT:**  HR RESTRUCTURING
**DATE:**     8/27/2002
**CC:**       VINCE JOHNSON

After collecting several months of data and carefully analyzing the operations of the Human Resources department, I recommend the following changes. These changes will better support the New Castle Call Center by dramatically increase our ability to become more efficient.

Ms. Ernestine Parker was hired in February 1998 as a receptionist at the New Castle Call Center. In November 2001, Ms. Ernie received a title change to reflect the daily functions she performed as an Administrative Assistant. As we upgraded several positions within HR to meet the growing business needs, Ms. Ernie's role began to evolve. As a result of this evolution, Ms. Ernie's position has outgrown her skills.

The New Castle Call Center's HR department has experienced a conversion in support needs. This transformation has driven our need for more specialized HR support and less administrative support.

As HR continues to develop, it is important to recognize flexibility and change as constant. As the Director, I recommend the following plan of action to address the current challenges of our growing business needs.

### RECOMMENDATION:

- Upgrade the Administrative Assistant position to HR Administrator.

    - This new position will focus more on HR aptitude and less on administrative roles and responsibilities. The new position will be exempt and carry a compensation of approximately 30-35k annually.

- Current Administrative Assistant does not qualify for this new position.

    - Ms. Ernie's positions will be eliminated. She will receive a 30-day notice period along with severance. Her last day of employment will be September 30, 2002. Ms. Ernie's severance period will total 5



DEPOSITION
EXHIBIT
Mesley 4
1026-0014

Comcast-Parker
027108

weeks, one week for each year of service. Ms. Ernie will be eligible for unemployment and Comcast will provide a suitable reference.

These decisions are never easy and I have put a lot of thought into possible alternatives. I have considered placing Ms. Ernie in another role/position at Comcast Cable however her knowledge of confidential information prohibits internal transfers.

This is the best decision for the department and ultimately for the Call Center. I would like your support with this decision so I can proceed with the process. I would be glad to answer any questions you may have related to this matter.

Sincerely


Philip T. Annone

2

Comcast-Parker
0273
B-109

Ms. Sandra Ricks began her employment with Suburban Cable on October 4, 1999 as a Customer Satisfaction Specialist. On October 9, 2001, Sandra received the position of Call Center Receptionist. On December 19, 2001, Sandra was promoted to Call Center Receptionist/Human Resources Administrative Assistant.

In the beginning of August 2002, the Senior Management Team began the tedious process of planing the 2002/3 New Castle Call Center budget. To meet the challenging needs of the budget this team discussed many changes, including the potential of staff reduction. One area of focus was the administrative support personnel. The team examined many alternatives including plans to explore the automation of services, which may eventually lead to the elimination of several Call Center positions. This was a very difficult process and much care and consideration was given. The decision was reached to move forward with automating the Call Center Receptionist/ Human Resources Administrative Assistant, Ms. Sandra Ricks.

## RECOMMENDATION:

Ms. Sandra Ricks position will be eliminated. She will receive a thirty- (30) day notice. Sandra will receive a severance. Her last day of employment will be September 30, 2002. Ms. Sandra Ricks severance period will total four (4) weeks, one week for each year of service. Sandra will be eligible for unemployment and Comcast Cable will provide a suitable reference.

## CERTIFICATE OF SERVICE

I, Victor F. Battaglia, undersigned counsel of record, hereby certify that on December 14, 2005, I caused a copy of the attached **APPENDIX TO PLAINTIFF ERNESTINE PARKER'S ANSWERING BRIEF IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** to be served on the following in the manner indicated:

### VIA ELECTRONIC FILING

William M. Kelleher, Esquire
Ballard Spahr Andrews & Ingersoll, LLP
919 Market Street, 12th Floor
Wilmington, DE 19801

### VIA FIRST CLASS MAIL

John B. Langel, Esquire
Farrah I. Gold, Esquire
Ballard Spahr Andrews & Ingersoll, LLP
1735 Market Street, 51st Floor
Philadelphia, PA 19103-7599

/s/ Victor F. Battaglia
Victor F. Battaglia (I.D. #156)